**NORTHWEST LOUISIANA FISH & GAME PRESERVE COMMISSION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 02–1031L.

United States Court of Federal Claims.

Oct. 29, 2004.

William P. Crews, Jr., Natchitoches, LA, for plaintiff.

David F. Shuey, U.S. Department of Justice, Washington, DC, with whom was Thomas L. Sansonetti, Assistant Attorney General for defendant. Matthew S. Clifford, U.S. Department of Justice, and Henry Black, U.S. Army Corps of Engineers, Vicksburg District, of counsel.

**ORDER GRANTING DISMISSAL**

FIRESTONE, Judge.

Pending before the court is the United States' Motion for Judgment on the Plead-

ings.[1] The United States argues that the action by Northwest Louisiana Fish & Game Preserve Commission (the "plaintiff") against the United States (the "government") for damages resulting from actions committed by the United States Army, Corps of Engineers ("COE") is barred both by the statute of limitations and for several additional reasons. For the reasons set forth below, the plaintiff's complaint is dismissed on the grounds that the action is barred by the applicable statute of limitations, 28 U.S.C. § 2501 (2004).

## BACKGROUND

This case involves actions taken by the COE in connection with the construction of the Red River Navigation Project (the "Project"). The parties agree that the COE entered into an agreement with the Red River Waterway Commission (the "RRWC"), an agency of the State of Louisiana, for the construction of the Project following the failure of Allen Dam in 1982. The parties agree that the Project provided for a 9–foot by 200–foot navigation channel extending about 236 miles from the junction of Red River with the Mississippi River, to Old River, and up Red River to the vicinity of Shreveport, Louisiana. The Project also called for five locks and adjacent dams to be constructed to provide the lift and permanent minimum pool levels to accommodate navigation.

The plaintiff alleges that it is charged by law with the control and management of Black/Clear Lake and the surrounding preserve, which is adjacent to Red River. In particular, the plaintiff alleges that it is charged by the State of Louisiana with the authority to make rules and regulations to manage and control the taking of fish and game from the preserve and do all things necessary to conserve and propagate fish and game in the preserve. The plaintiff charges that its ability to manage Black/Clear Lake has been impaired by the COE's actions on Red River.

Although the State of Louisiana rather than the plaintiff owns Black/Clear Lake, the plaintiff alleges that with regard to its relationship to the Black/Clear Lake Complex, it is the "alter ego" of the State. In its Amended Complaint[2], the plaintiff alleges the COE interfered with its ability to fulfill its obligations with respect to Black/Clear Lake by raising the pool level of Pool 3 from 88 feet M.S.L. to 95 feet M.S.L. As a consequence, the plaintiff has not been able to adequately draw down, or adjust to a lower level, the water level in Black/Clear Lake. The plaintiff claims that the inability to draw down the water level has prevented the plaintiff from being able to effectively manage undesirable aquatic weed growth on Black/Clear Lake. Specifically, the plaintiff contends that a severe hydrilla and coontail[3] problem have rendered a large portion of the lake inaccessible by boat, and that the plaintiff's ability to manage the lake's fish populations has been severely impaired. The plaintiff characterizes this accumulation of undesirable aquatic growth as a continuing trespass and/or continuing nuisance, as well

---

1. Also pending before the court are the plaintiff's October 12, 2004 Motion for Leave to File a Second Sur-reply and the government's October 26, 2004 Opposition to Plaintiff's Motion for Leave to File Sur-reply and Response Thereto. Much of the information presented in the brief and the attached exhibits did not directly address the central issue in this case, to wit, at what point the plaintiff knew or should have known that the government had taken its ability to draw down Black/Clear Lake. However, as the parties agree, it is soundly within the discretion of the trial court to grant leave to a party to file subsequent briefing. In this case, the government was given the time and the opportunity to respond to the plaintiff's brief. While it is far from ideal that a party should file a brief only days before oral argument, in this case the court finds that the plaintiff's late filing does not prejudice the government in any way. Accordingly, the plaintiff's October 12, 2004 Motion for Leave to File a Second Sur–Reply is **GRANTED**, and has been considered to the extent that the evidence submitted is relevant. The information contained in the government's Opposition has also been considered by the court.

2. The plaintiff has previously asserted this allegation in federal court. The plaintiff's complaint in CV01–1264, filed against the COE in the District Court for the Western District of Louisiana on July 5, 2001, is virtually identical to the amended complaint filed by the plaintiff in the present action.

3. Hydrilla and coontail are types of aquatic weeds.

as an unlawful appropriation of lands, waters and properties, without full and fair just compensation.[4]

It is not disputed that during the planning phase of the Project, and as early as 1988, various branches of the State of Louisiana sent and received letters noting that the planned raising of the pool level would interfere with the plaintiff's ability to control aquatic growth in Black/Clear Lake. In these letters, various units of the State of Louisiana noted, *inter alia*, that the plaintiff's ability to draw down the pool level would be impaired by the COE's action, and that this inability to draw down the water level would lead to undesirable aquatic growth. It was further noted that the estimated cost of using alternative methods to control aquatic growth in Black/Clear Lake would amount to $7,750,000.

As early as 1988, close in time to the beginning of the Project, Neil Wagoner of the State of Louisiana Department of Transportation and Development informed the COE that raising the level of Pool 3 would interfere with the ability to control aquatic growth in Black/Clear Lake. In a letter to Colonel Skidmore of the COE, Mr. Wagoner wrote: "I am in receipt of your letter of August 30, 1988 regarding Pool 3 of the Red River Waterway Project and the effects this pool may have on Nantachie, Black–Clear and Saline Lakes. . . . [T]he proposed navigation pool level will interfere with lake management activities normally carried out by the Louisiana Department of Wildlife and Fisheries." Letter from Wagoner to Skidmore of 10/7/88.

Only one week later, Virginia Van Sickle, of the State of Louisiana Department of Wildlife and Fisheries, wrote to the Louisiana Department of Transportation and Development, more specifically outlining the damages that would be caused by the government's elevation of Pool 3. Van Sickle wrote: "Black–Clear Lake will have a 4.5 ft. drawdown capability at the 95.0 M.S.L. elevation at Pool 3. A normal drawdown from 8—10 ft. is required for most nuisance aquatic plants." Letter from Van Sickle to Patterson of 10/14/88. Van Sickle indicated a specific time frame in which the damage would occur. She noted that "[d]rawdowns on Black Lake average once per every three years, with certain years having successive mid-June to mid-January and Labor Day to mid-January drawdowns to control various types of nuisance aquatic growth." *Id.*

In response to the State of Louisiana's concerns about its inability to manage the aquatic growth in Black/Clear Lake, in 1989 David Haworth III of the COE informed the plaintiff of its findings: "We have found that the drawdown of the lake will be less than is desired by the Lousiana Wildlife and Fisheries Staff. However, Pool No. 3 will allow 4.5 feet of drawdown with the 95–foot pool level." Letter from Haworth to Cunningham of 3/29/89. Far from concealing its intention, the COE made it very clear to the plaintiff at this time that it intended to go ahead with the Pool 3 water level increase, despite the fact that the resultant limited drawdown would be insufficient to cure the inevitable aquatic growth. In response to the plaintiff's request for relief from the COE's decision, the COE stated that it "cannot commit to Federal implementation of any corrective measures for Black Lake." *Id.*

The State of Louisiana Department of Wildlife and Fisheries took the additional step of calculating the loss that it expected to suffer due to its inability to draw down water from Black/Clear Lake. In a letter to Senator Bennett Johnston, the Department of Wildlife and Fisheries first recounted the effect of the inability to control the water level in Pool 3 following its elevation: a less than optimal

4. In response to the government's Motion for Judgment on the Pleadings, the plaintiff, without seeking leave from the court to amend its complaint, added a second claim in its subsequent briefing. In its Opposition to Motion for Judgment on the Pleadings, filed April 28, 2004, the plaintiff alleged that its land has experienced a drastic increase in flooding from Black/Clear Lake as a result of the raising of the water level of Pool 3 and that this land, which is contiguous to Black/Clear Lake, has been damaged by these flood waters. However, during a status conference held on Monday, September 13, 2004, the plaintiff stated that it is no longer seeking damages on this ground, and that its claim was limited to compensation for damage due to aquatic growth.

drawdown "without incorporation of other aquatic plant management disciplines would exacerbate aquatic weed infestation and expand the problem area." Letter from Herring to Johnston of 7/27/92. In the same letter, the State of Louisiana Department of Wildlife and Fisheries stated that, due to the raising of the pool level, it projected the cost of controlling aquatic growth over the lifetime of the Project to be $7,575,000. The Department of Wildlife and Fisheries stated that "[t]his amount would be acceptable to the Department for mitigation of losses" to Black/Clear Lake. *Id.*

In response, the COE reiterated that it had no intention of altering its plan to raise the pool level to 95 feet M.S.L. Letter from Petersen to Herring of 9/16/92. While it noted that it did not believe that the negative effects on Black/Clear Lake would be as dire as the State of Louisiana had anticipated, it made no attempt to disguise the fact that it did not intend to address the situation in any way. Rather, recognizing that "our recommended plan ... does not provide the full drawdown capabilities the lakes currently have" the COE simply stated that "we propose no action for Clear–Black Lake." *Id.*

Despite the State of Louisiana's repeated contentions that Black/Clear Lake would be harmed by raising the water level to 95 feet M.S.L., the COE raised the pool level to 95 feet M.S.L. in December 1994. The plaintiff's counsel represented that, in 1994, prior to raising the pool level to 95 feet M.S.L., the plaintiff was able to draw down Black/Clear Lake to address a problem with hydrilla, but that the problem returned once the pool was elevated in December 1994 and the plaintiff could no longer draw down the Lake.[5] The plaintiff's counsel also represented that in 1995 the COE "indicated" that it might be willing to allow for greater drawdown; however, the plaintiff did not provide any evidence to support this assertion.[6]

The government moved, on March 31, 2004, for judgment on the pleadings, arguing the following: 1. the period of limitations within which to bring this action has expired because the plaintiff was aware of the alleged damage more than six years before it brought the original federal suit in 2001; 2. this court has no subject matter jurisdiction because the wrongs alleged amount not to a taking but rather to a tort, which is not within this court's jurisdiction; 3. the plaintiff does not have standing to bring this suit because the State of Louisiana, and not the plaintiff, is the owner of the allegedly damaged property; 4. the harm as alleged is harm to water in a navigable stream and to land below the high water mark, and as such, any rights that the plaintiff may have are subordinate to the government's navigational servitude.

After briefing was closed, oral argument was held on October 15, 2004.

## DISCUSSION

### A. Standard of Review

This matter comes before the court on the government's Motion for Judgment on the Pleadings. The government contends that this court is without jurisdiction to hear the present dispute. The plaintiff bears the burden of establishing jurisdiction when the government has raised the issue in a dispositive motion. *Myers v. United States,* 50 Fed.Cl. 674, 680 (2001); *see Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed. Cir.1988). The court construes allegations in the complaint most favorably to the plaintiff, resolving ambiguities in its favor. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). However, the court may look beyond the pleadings and "inquire into jurisdictional facts" in order to determine whether jurisdiction exists. *Rocovich v. United States,* 933 F.2d 991, 993 (Fed.Cir.

---

5. The plaintiff has provided the court with the deposition of Mr. Guidry, of the RRWC, taken in conjunction with earlier litigation involving the same issue. Mr. Guidry stated that hydrilla is very difficult to control, noting "I don't know if anything can control [hydrilla] ... once that tuber is established." Deposition of Guidry of 7/16/99 at 55.

6. The plaintiff relied on Exhibit K to support this argument. However, there was no Exhibit K attached to the plaintiff's brief and the government represents that it was not able to obtain a copy of Exhibit K despite requests to the plaintiff's counsel.

1991). In the present case, the court has been presented with matters outside the pleadings, namely documents offered by the plaintiff and the government in the appendices to their respective filings. The court notes that the plaintiff does not dispute any of the facts in the documents presented to the court. The court will rely on these matters to the extent that they allow the court to determine whether it has jurisdiction over this case.

The government has focused its motion for judgment on the pleadings on the argument that the plaintiff's claim is barred by the applicable statute of limitations. "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501; *see Caguas Cent. Fed. Sav. Bank v. United States,* 215 F.3d 1304, 1310 (Fed.Cir.2000). In this circuit, compliance with the statute of limitations, 28 U.S.C. § 2501, is considered to be a condition of the government's waiver of sovereign immunity. *Forman v. United States,* 329 F.3d 837, 841 (Fed.Cir.2003); *cf. Ariadne Financial Services v. United States,* 133 F.3d 874, 878 (Fed.Cir.1998). Therefore, if the claim was not filed against the government within six years of the accrual of the cause of action, this court must dismiss the complaint for lack of subject matter jurisdiction. *Forman,* 329 F.3d at 841.

■ Normally, a case must be filed in the proper court within six years of the accrual of the cause of action in order for the case to be considered timely filed. However, when "a claim is transferred to the United States Court of Federal Claims for lack of jurisdiction from a United States District Court, as was the case here, the applicable filing date is the date when the claim was originally filed in the transferring court." *Chandler v. United States,* 47 Fed.Cl. 106 (2000); *see* 28 U.S.C. § 1631 (2004). In this case, the plaintiff filed this claim in the District Court for the Western District of Louisiana on July 5, 2001. Therefore, the case is deemed filed in the Court of Federal Claims by this date as well.[7]

The court assumes without deciding, for the purposes of this order, that the plaintiff has properly alleged a Fifth Amendment takings claim. The viability of the plaintiff's claim, therefore, depends initially on whether it was filed within six years of its accrual. *Forman,* 329 F.3d at 841.

■ "In general, a takings claim accrues when all events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." *Boling,* 220 F.3d at 1370. "The question whether the pertinent events have occurred is determined under an objective standard; a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue." *Fallini v. United States,* 56 F.3d 1378, 1380 (Fed.Cir.1995). In the case of damage to property that occurs over a period of time rather than all at once, the courts have utilized the concept of stabilization to prevent injustice due to the harsh application of the rules of accrual. *United States v. Dickinson,* 331 U.S. 745, 748, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947) ("The Fifth Amendment expresses a principle of fairness and not a technical rule of procedure enshrining ... niceties regarding 'causes of action'-when they are born, when they proliferate, and when they

7. The plaintiff has argued that the statute of limitations should be tolled until 1996 because the government was not on notice until that time that the plaintiff's property interest had been taken. The plaintiff's assumption, that the government's knowledge of its taking is relevant to the determination of the accrual date, is incorrect. The only relevant relationship between notice and accrual is that accrual depends on the when the *plaintiff* knew, not when the government knew, that the plaintiff had been injured. *Boling v. United States,* 220 F.3d 1365, 1370 (Fed.Cir.2000). The subsequent discussion of ac-

crual will therefore focus on when the plaintiff, not the government, first perceived that the plaintiff had a cause of action. Similarly, the plaintiff argues that, even if the statute of limitations has run, fairness dictates that the court toll the statute of limitations. However, in this jurisdiction the statute of limitations is a condition of the waiver of sovereign immunity and cannot be "waived by either the Court of Federal Claims or the parties." *Alder Terrace, Inc. v. United States,* 161 F.3d 1372, 1377 (Fed.Cir.1998). Therefore, the court has no power to hear this dispute if the statute of limitations has run. *Id.*

die."); *see Applegate v. United States,* 25 F.3d 1579, 1583 (Fed.Cir.1994).

However, so as not to indefinitely postpone the date of accrual, the Federal Circuit has held that "stabilization occurs when it becomes clear that the gradual process set into motion by the government has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined." *Boling,* 220 F.3d at 1370–71. In other words, when the facts are such that it is uncertain that a permanent taking will occur, the plaintiff need not sue; however, "once it is clear that the process has resulted in a permanent taking and the extent of the damage is reasonably foreseeable, the claim accrues and the statute of limitations begins to run." *Id.* at 1371. Importantly, the focus for the purposes of accrual is on the alleged act of the government, and not on the time when the damage suffered by the plaintiff is "most painful." *Id.* (citing *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980)).

In sum, in order to determine when the plaintiff's cause of action accrued, and thus when the statute of limitations began to run, the court must determine a date after which the plaintiff knew or should have known that the government committed acts that would, over time, result in a permanent taking, and that the extent of the damage was reasonably foreseeable. *See Dickinson,* 331 U.S. at 748, 67 S.Ct. 1382; *Boling,* 220 F.3d at 1370–71; *Fallini,* 56 F.3d at 1380.

**B. The Plaintiff's Claim of a Taking Based on the Raising of the Level of Pool 3 is Time–Barred**

 The government contends that the statute of limitations started to run with regard to the plaintiff's claims as of December 1994, when Pool 3 reached 95 feet M.S.L. and the plaintiff lost its ability to draw down Black/Clear Lake. Thus, the government argues that the present action is barred be-

cause it was filed in 2001, more than six years after December 1994. The court agrees that the key question for the purposes of accrual is when the plaintiff knew or should have known that the government committed acts that would, over time, result in a permanent taking, and that the extent of the damage was reasonably foreseeable. *See Dickinson,* 331 U.S. at 748, 67 S.Ct. 1382; *Boling,* 220 F.3d at 1370–71; *Fallini,* 56 F.3d at 1380.

With regard to aquatic weed growth, the plaintiff not only should have known but did in fact know about the damage that was going to occur as a result of raising the pool level. In each of the letters sent to or from arms of the State of Louisiana between the years 1988 and 1992, the State of Louisiana, which the plaintiff accepts as its "alter ego," was either informed by or informing another party of the aquatic weed growth which would occur as a result of the government's raising of the water level in Pool 3. The State of Louisiana was specifically aware that it would be unable to control aquatic growth in Black/Clear Lake by adjusting the water level. The State of Louisiana was informed that the COE had no intention of changing its plans to raise the pool level, despite the State's concerns about the damage due to aquatic growth. When the COE actually raised the pool level, in December 1994, the plaintiff surely knew that the government had committed all the acts necessary in order to permanently take its property. *See Boling,* 220 F.3d at 1370–71.[8]

Crucial to the determination that the plaintiff's cause of action accrued in December of 1994 and not in 1995, as the plaintiff alleges, is the fact that the plaintiff had arrived at an exact figure for the value of the damage that would be caused by the government's acts. As noted, in the letter to Senator Johnston, the State of Louisiana Department of Wildlife and Fisheries projected the cost of controlling aquatic growth over the lifetime of the Project to be $7,575,000. The Department of Wildlife and Fisheries stated that

---

8. The plaintiff's contention that it did not know of the extent of the hydrilla problem until the problem returned after the 1994 drawdown is not supported. The undisputed record evidence demonstrates that the hydrilla problem existed in 1994 prior to the time the government raised the water level in Pool 3. In addition, as noted in footnote 5, once the hydrilla plant takes root, drawing down the water level might not be sufficient to address the problem.

"[t]his amount would be acceptable to the Department for mitigation of losses" to Black/Clear Lake. Letter from Herring to Johnston of 7/27/92. By calculating as early as 1992 the amount that it would be damaged by the government's action, the plaintiff meets the requirement for accrual that the damages incurred be reasonably foreseeable. *Boling*, 220 F.3d at 1370. As noted, the damages in this case were not only foreseeable, but in fact foreseen.

Importantly, in its October 14, 1988 letter to the State of Louisiana Department of Transportation and Development, the Department of Wildlife and Fisheries also indicated a specific time frame in which the damage would occur. By noting that "[d]rawdowns on Black Lake average once per every three years" and by noting that Black/Clear Lake's drawdowns were going to be subnormal after the raising of Pool 3, the Department of Wildlife and Fisheries indicated that it understood that the plaintiff's damage would become permanent once the plaintiff was no longer able to draw down Black/Clear Lake as scheduled. That the State of Louisiana was on notice that there was a short, definite time period between the government's action and the permanent taking by aquatic growth further supports the inference that the damage was foreseeable. *See Boling*, 220 F.3d at 1370.

The plaintiff does not dispute that it had knowledge of the problems associated with raising Pool 3 to 95 feet M.S.L. prior to the actual raising of Pool 3. Instead, the plaintiff argues that it was not possible to determine the full impact of the COE's action for several more years and thus it should not be held to the December 1994 date. More specifically, the plaintiff relies on the 1999 testimony of Ken Guidry of the RRWC. Mr. Guidry was asked in a deposition in another case whether "there [was] any reason to anticipate that problem[s associated with aquatic growth] would ultimately develop as a result" of raising the pool level to 95 feet M.S.L. Deposition of Guidry of 7/16/99 at 193–95. In response, he replied: "Not by the Red River Waterway Commission." *Id.* Mr. Guidry was not asked, and did not testify, about what other branches of the State of Louisiana

knew or what the plaintiff in this case knew prior to December of 1995. Mr. Guidry's single statement does not cast into doubt the level of knowledge evinced by the numerous statements made by representatives of the State of Louisiana regarding the impact that raising Pool 3 would have on Black/Clear Lake.

The plaintiff also relies on correspondence between the COE and the Louisiana Department of Wildlife and Fisheries in 1992 to show that the COE was unclear about whether it would correct any problem caused by raising the pool level to 95 feet M.S.L. Letter from Petersen to Herring of 9/16/92. The plaintiff argues that the statute of limitations did not begin to run until the plaintiff fully understood the problem developing on Black/Clear Lake, that is, when the weeds became unmanageable. However, by arguing that the government's taking did not take place until the aquatic growth became unmanageable, the plaintiff misunderstands the nature of the claim at issue in this case.

In support of this argument, the plaintiff cites *Alder Terrace* for the proposition that the limitations period does not begin to run until a claimant has suffered a compensable injury, that is, when the damage to Black/Clear Lake was complete. The plaintiff correctly cites the standard in *Alder Terrace*, but misapplies this standard to the present case. The taking in this case occurred when the plaintiff lost its ability to drain Black/Clear Lake. The damage which resulted from this taking, the inability to manage weed growth on the lake, was the inevitable consequence of the government's single action of raising the water level of Pool 3. Indeed, the above-noted facts demonstrate that the full extent of the plaintiff's damage was known when the COE was simply planning to raise the level of Pool 3. The plaintiff, therefore, did not have to wait for the weeds in Black/Clear Lake to become unmanageable before it was obligated to sue. The plaintiff knew that the weeds in Black/Clear Lake would become unmanageable once it no longer was able to draw down Black/Clear Lake.

It is for this reason that *Alder Terrace* itself undercuts the plaintiff's claim. In that case, which was a contract action, the court

found that the cause of action accrued when the defendant breached its contract with the plaintiff, and not when the plaintiff suffered monetary harm. The court held that the plaintiff in that case did not need to wait to sue until it suffered the actual monetary harm which the breach of contract foretold. The breach was *itself* the harm and started the limitations period running. *Alder Terrace,* 161 F.3d at 1377. In the present case, by comparison, the taking occurred when the COE raised the pool level because, at that moment, the government took away the plaintiff's right to draw down Black/Clear Lake which, it was understood, would inevitably result in unmanageable weed growth. The full extent of the actual harm caused by the aquatic growth in Black/Clear Lake is analogous to the economic harm in *Alder Terrace.* In both instances, a single government action (i.e. the breach of contract in *Alder Terrace* and the raising of the pool level in the present case), gave rise to the legal claim. *See id.* The plaintiff confuses the existence of damages with the existence of a cause of action. Consequently, *Alder Terrace* does not support the plaintiff's conclusion that the cause of action did not begin to accrue until the consequences of the taking were fully known; rather it supports the opposite conclusion, that the cause of action began to accrue as soon as the government action giving rise to the inevitable weed infestation took place.

It is for these reasons that the plaintiff's reliance on *Dickinson* is misplaced. The plaintiff relies on *Dickinson* to support its view that a taking does not occur until all the effects of the taking are known. In *Dickinson,* the Supreme Court held that when the physical taking of land occurs by a slow, continuing process, courts will toll the statute of limitations until the nature and extent of the taking is clear. *Dickinson,* 331 U.S. at 749, 67 S.Ct. 1382. *See also Fallini,* 56 F.3d at 1381–82 (characterizing the holding of *Dickinson.*) The plaintiff argues that, because the weeds accumulated gradually, the taking did not occur until the lake became unmanageable. *Dickinson* is inapplicable for several reasons. First, as the Court of Claims and the Federal Circuit have repeatedly held, *Dickinson* has been "more or

less limited to the class of flooding cases to which it belonged." *Fallini,* 56 F.3d at 1381–82 (citing *Kabua v. United States,* 212 Ct.Cl. 160, 546 F.2d 381, 384 (1976); *Hilkovsky v. United States,* 205 Ct.Cl. 460, 504 F.2d 1112, 1114 (1974)). In the present case, the plaintiff's claim is not based on a gradual taking resulting from continuing flooding, but rather on gradual harm caused by a discreet, singular act: the taking of the right to drain water from Black/Clear Lake into Red River.

Moreover, unlike in *Dickinson* and other flooding cases, in the present case the government has not caused any direct invasion of the plaintiff's land. The government's action only indirectly affected the management of the plaintiff's aquatic weed problem; importantly, the government did not introduce aquatic weeds into the weeds into Black/Clear Lake.

Finally, even the liberal accrual standard found in *Dickinson* is met in this case. *Dickinson* held that accrual occurs, and that the statute of limitations begins to run, when "the consequences of inundation have so manifested themselves that a final account may be struck." *Dickinson,* 331 U.S. at 749, 67 S.Ct. 1382. The purpose of this rule is to prevent plaintiffs from being obligated to sue until they are aware of how much damage they have suffered. In the present case, the plaintiff had calculated in 1992 the exact value of the damage that it would suffer due to the government's action. The plaintiff even offered that it would accept this amount, $7,575,000 as adequate compensation. The plaintiff could identify the exact amount of damage because the plaintiff knew the exact boundaries of the property which would be damaged upon the raising of Pool 3. Thus, the purpose of *Dickinson's* liberal accrual standard, that the plaintiff not be forced to sue before a final account may be struck and before the extent of the damage is known, is satisfied in this case.

In sum, the government has shown that no later than when the government raised the level of Pool 3 to 95 feet M.S.L., in December 1994, the plaintiff knew or should have known that raising the pool level would, in a short, fixed period of time, result in a per-

manent taking of Black/Clear Lake due to uncontrolled aquatic growth, and that the extent of the damage was reasonably foreseeable. *See Dickinson,* 331 U.S. at 748, 67 S.Ct. 1382; *Boling,* 220 F.3d at 1370–71; *Fallini,* 56 F.3d at 1380. Therefore, accrual of the plaintiff's cause of action with regard to the alleged taking due to aquatic growth occurred no later than December 1994.

As noted, "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. This statute of limitations directs the court to dismiss any claim for lack of subject matter jurisdiction which is filed later than six years after the plaintiff's claim has accrued. *Forman,* 329 F.3d at 841. Because accrual in this case took place no later than December 1994, and because the plaintiff first filed its claim in July 2001, more than six years after accrual, the claim is barred by the statute of limitations, 28 U.S.C. § 2501. *See Forman,* 329 F.3d at 841.[9]

## CONCLUSION

In light of the foregoing, the court finds that the plaintiff's claims, which stem from an allegation of a taking due to uncontrolled aquatic growth, are barred from this court due to the requirements of 28 U.S.C. § 2501. The government's March 31, 2004 motion for judgment on the pleadings is therefore **GRANTED.** The clerk is directed to enter judgment accordingly. Each party is to bear its own costs.

---

9. Because the court finds that the statute of limitations bars the plaintiff's suit in this court, the court finds no need to reach the other defenses proffered by the government. Therefore, the court does not decide whether: 1. the plaintiff has standing to bring this suit; 2. the government's navigational servitude extends to the takings claim due to aquatic growth; or 3. whether this suit as alleged is a taking or rather a tort not cognizable in the Court of Federal Claims.