# United States Court of Appeals for the Federal Circuit

05-5031

NORTHWEST LOUISIANA FISH & GAME PRESERVE COMMISSION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

William P. Crews, Jr., of Natchitoches, Louisiana, for plaintiff-appellant.

David F. Shuey, Attorney, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, for defendant-appellee. With him on the brief were Kelly A. Johnson, Acting Assistant Attorney General, and Matthew S. Clifford and Katherine J. Barton, Attorneys.

Appealed from: United States Court of Federal Claims

Judge Nancy B. Firestone

# United States Court of Appeals for the Federal Circuit

05-5031

NORTHWEST LOUISIANA FISH &
GAME PRESERVE COMMISSION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED:  May 2, 2006

_____

Before, NEWMAN, LOURIE, and RADER, Circuit Judges.

Opinion for the court filed by Circuit Judge RADER.  Dissenting opinion filed by Circuit Judge LOURIE.

RADER, Circuit Judge.

The United States Court of Federal Claims dismissed the Northwest Louisiana Fish and Game Preserve Commission's (the Commission's) takings claim against the United States as filed after the statute of limitations.  See 28 U.S.C. § 2501;[1]  Nw. La. Fish & Game Pres. Comm'n v. United States, No. 02-1031L, slip op. at 20 (Fed. Cl. Oct. 29, 2004) (Final Decision).  The Commission alleged that the United States Corps of Engineers (Corps) Red River Navigation Project (the project) effected the taking.  The Corps project limited the ability of

---

[1]  "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."  28 U.S.C. § 2501 (West Supp. 2005).

the Commission to draw down the level of Louisiana's Black Lake. Accordingly, the Commission could not control the growth of vegetation in the lake. The complaint alleges that the vegetation rendered the northern part of the lake inaccessible, unmanageable, and virtually useless, resulting in a taking.

Because the growth of vegetation was a slow natural process that had not stabilized to cause the taking claim to accrue until at least 1997, this court reverses the decision of the Court of Federal Claims, and remands for further proceedings as appropriate.

I.

This case arises from a conflict between the Commission's responsibility to maintain a natural preserve and the Corps' responsibility to maintain year-round riparian navigation. The Commission manages the Northwest Fish and Game Preserve, a complex of land and lakes maintained for recreation and for preservation of wildlife and fisheries. The Preserve includes two lakes, collectively referred to here as Black Lake. Black Lake is subject to the growth of aquatic weeds. The Commission controls these weeds by draining, or drawing down, the lake into the Red River.

In 1968, Congress authorized the Corps's Red River project to assure year-round navigation on the Red River. River and Harbor Act of 1968, Pub. L. No. 90-483, § 101, 82 Stat. 731 (1968) (amended by Pub. L. 94-587, § 187, 90 Stat. 2942 (1976)). To achieve this purpose, the Corps constructed a series of locks and dams on the river. This case involves the pool (Pool 3) created by the third lock and dam (L & D 3). The water level in Pool 3 directly affects the draw

down potential of Black Lake, which in turn may affect the growth of the aquatic weeds.

In 1984, the Corps approved a design for L & D 3 that would impound water in Pool 3 at ninety-five feet above Mean Sea Level (95 MSL), 4.5 feet lower than the ordinary elevation of Black Lake. This impoundment limited the drawdown capability for Black Lake to about 4.5 feet, between 3.5 and 6.5 less than the Commission allegedly requires for weed control. When the construction of L & D 3 began in 1988, the Louisiana Department of Transportation and Development (the Department) notified the Corps that the new water level could impede the Commission's regular lake management activities. The Department requested the Corps to seek alternatives to alleviate the potential detrimental impacts.

In 1988, 1989 and 1991, the Corps conducted studies on the control of hyacinths or waterlilies. Hydrilla, a submerged weed, was not a concern at that time. In 1989, the Corps initial studies of Black Lake focused on flood flows, and these studies indicated that Pool 3 would have no adverse effect on the capability of evacuating flood flows. The Corps also stated that it was investigating alternatives to allow an increase in drawdown capability, and made a point of noting that before it would make a final determination on alternatives, that it had continuing authority to study and better define the impact of Pool 3 on the lakes.

In 1991, the Corps performed more studies of Pool 3's impact on Black Lake Complex and gave an assessment that provided various alternatives for

each lake, stating that its assessment could still, nevertheless, be revised. In 1991, the Corps also stated that the need for further corrective actions would be evaluated when the data showed a need, and that the Corps would continue to request the Commission's staff's input concerning efforts to minimize the effects of Pool 3.

In 1992, the Corps advised the Commission that it was continuing to study the impact of Pool 3, and it noted that since most weed growth occurred at depths less than about 5 feet that it did not believe that the loss of the drawdown capability would have any measurable impact on the environmental quality of the lake. However, the Corps started a five year lake monitoring study to determine the effects of the operation on the navigation pool, which was scheduled to be completed in 1998. Thus, studies continued beyond December 9, 1994, when the designed elevation of 95 MSL for Pool 3 was reached, and these studies provided conflicting opinions on whether a problem would ultimately develop. After the complete elevation of Pool 3, the Corps continued to study, inter alia, Pool 3 so that it could determine whether additional project requirements should be implemented to minimize the impacts on the lakes.

Nearly two years after Pool 3 reached 95 MSL and after the completion of L & D 3, hydrilla emerged as a problem for the first time in the fall of 1996. Though hydrilla had been discovered in 1993, it was believed killed by a drawdown in May of 1994. It was rediscovered again sometime in 1995, but it was not until 1996 that detailed studies showed it was spreading to an extent that it had become a problem. As a result, on October 4, 1996, the Assistant

Secretary-Treasurer of the Commission informed the Red River Waterway Commission (RRWC), a Louisiana entity created to collaborate with the Corps on the project, of the hydrilla problem and the need for another drawdown. The Secretary-Treasurer asked if there was "any possibility" of lowering the water level in Pool 3 to allow such an action. The RRWC passed the question to the Corps. While waiting for a response from the Corps, on December 4, 1996, the Commission meeting minutes noted that the hydrilla had just been reported as breaking up and spreading through the lakes. In January of 1997 the RRWC received a response from the Corps. The RRWC advised the Commission that, though it had requested the Corps to determine if Pool 3 could be manipulated to accommodate the proposed eight-foot drawdown, the Corps flatly responded that it would not allow the proposed drawdown. Thus, it was not until January of 1997 that the Corps, for the first time, refused a drawdown, and instead suggested that the Commission attempt to control the weed growth with herbicides and a limited available four-foot drawdown.

As a result, in February 1997, the Commission filed in state court a claim for land appropriation and/or inverse condemnation against the RRWC. RRWC, in turn, impleaded the Corps as a third party defendant. The Corps had the suit removed to the United States District Court for the Western District of Louisiana. The district court essentially allowed RRWC to withdraw from the case because the Corps bore sole responsibility for raising the water level in Pool 3. Nw. La. Fish & Game Pres. Comm'n v. Red River Waterway Comm'n, No. 97-1984, slip op. at 9 (W.D. La. July 28, 1999).

05-5031                                              5

The Commission then submitted, on December 5, 2000, an administrative claim against the Corps. In this claim, the Commission requested $30,000,000 for "curative work" and "associated damages." The Commission claimed that the new water level in pool 3 as of January 1995 caused the uncontrollable growth of aquatic vegetation. The Commission also claimed that Preserve property contiguous to the lake had been damaged as a result of floods also attributable to the level of pool 3.

On January 12, 2001, the Corps office in Vicksburg, Mississippi rejected the claim as improperly filed. The Vicksburg office noted, inter alia, that the Commission had stated that the date of the incident leading to damage was "January 1995," outside of the two-year statute of limitations for the Federal Tort Claims Act. The Corps' district counsel in Vicksburg added that "none of my comments are to be construed as a final agency decision on your letter." Although the Vicksburg office asked the Commission to "clarify the intent" of its submission, the record does not show any further correspondence between the Commission and Vicksburg.

On July 5, 2001, the Commission filed suit in the District Court for the Western District of Louisiana against the United States, under the Federal Torts Claim Act (28 U.S.C. § 2675), and as a taking. In this suit, the Commission asserted that it had been prevented from carrying out its duties in managing the Preserve, and noted that curative costs would be approximately twenty-six million dollars. The district court found that the tort claim was barred under 28 U.S.C. §

2401(b)[2]; <u>Nw. La. Fish & Game Pres. Comm'n v. United States</u>, Civil Action No. 01-1264, Report and Recommendation at 11 (Apr. 1, 2002). The district court held that the tort claim had accrued by January 1997, when a committee of the Commission authorized legal action, but the filing date of the suit in July 2001 exceeded the two-year statute of limitations for tort claims. <u>Id.</u> at 9. The district court then transferred any possible taking claim to the Court of Federal Claims, which would properly be brought under the Tucker Act (28 U.S.C. § 1491), which has a six year statute of limitations. <u>Nw. La. Fish & Game Pres. Comm'n v. United States</u>, No. 01-1264, slip op. at 1 (W.D. La. June 11, 2002).

In the Court of Federal Claims, the Commission amended its complaint to allege loss of use of land and water, diminution in market value of land, interference with wildlife habitat and recreational purposes, and damage to its property as a result of the raising of the water level of Pool 3 from 87 MSL to 95 MSL. The United States moved for dismissal for lack of subject matter jurisdiction, on the ground that the action, originally filed in July 2001, was barred by the six-year statute of limitations of 28 U.S.C. § 2501. The court granted the motion, holding that "accrual of the plaintiff's cause of action with regard to the alleged taking due to aquatic growth occurred no later than December 1994," when the Corps raised the level of Pool 3 to 95 MSL. <u>Final Decision</u>, slip op. at 20. The court reasoned that at that time the Commission knew "about the damage that was going to occur as a result of raising the pool level." <u>Id.</u> at 13.

---

[2] "A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate federal agency within two years after such claim accrues." 28 U.S.C. § 2401(b) (West 1994).

Further, the court noted that the Commission had calculated, "as early as 1992," the cost of controlling the aquatic growth over the lifetime of the project—$7,575,000. It, thus, concluded the damages in this case "were not only foreseeable, but foreseen" even before 1994. Id. at 14. The Commission appeals the dismissal disputing the accrual date, for purposes of the statute of limitations, that was arrived at by the Court of Federal Claims.

III.

This court has jurisdiction under 28 U.S.C. § 1295(a)(3). "Whether the Court of Federal Claims possesses subject matter jurisdiction is a question of law subject to de novo review." Western Co. v. United States, 323 F.3d 1024, 1029 (Fed. Cir. 2003). In addition, this court reviews de novo whether the Court of Federal Claims properly dismissed a complaint for failure to state a claim. Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed.Cir.2002) (citing Dehne v. United States, 970 F.2d 890, 892 (Fed. Cir. 1992)). "[I]n reviewing a dismissal for failure to state a claim, we must assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant." Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991).

This appeal only presents the application of the Title 28, section 2501 six-year statute of limitations to the Commission's claim. The Commission filed its tort and takings claims in the Western District of Louisiana on July 5, 2001. The trial court correctly accepted this date as the appropriate filing date for the takings claim. Final Decision at 10.

A taking occurs when governmental action deprives the owner of all or most of its property interest. United States v. Gen. Motors Corp., 323 U.S. 373, 378 (1945) (The word "property" "denote[s] the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it."). For example, "[w]here the government by the construction of a dam or other public works so floods lands belonging to an individual as to substantially destroy their value there is a taking within the scope of the Fifth Amendment." United States v. Lynah, 188 U.S. 445 (1903). The Supreme Court has held that "[t]he backing of water so as to overflow the lands of an individual . . . if done under statutes authorizing it for the public benefit, is such a taking as by the constitutional provision demands compensation." Pumpelly v. Green Bay & Miss. Canal Co., 80 U.S. 166, 172 (1871).

In this case, the accrual date of such a takings claim depends on several factors because the damage occurs gradually both as the water level increases and as the aquatic vegetation becomes uncontrollable. The Commission argues that its "right to possess, use, regulate, and maintain the property in question was appropriated" by the Corps when the Corps refused to cooperate in a proposed drawdown of Black Lake to mitigate the growth of hydrilla and other aquatic plants. Thus, according to the Commission, the taking accrued in 1997, after both the appearance of significant hydrilla growth and the Corps' first definite refusal to draw down the water level or otherwise help the Commission mitigate its damages.

However, the trial court set the accrual date in 1994. The trial court reasoned that "a takings claim accrues when all events which fix the [G]overnment's alleged liability have occurred and the plaintiff was or should have been aware of their existence." Final Decision, slip op. at 11; see also Japanese War Notes Claimants Ass'n of the Philippines, Inc. v. United States, 178 Ct. Cl. 630, 632 (Ct. Cl. 1967), cert. denied, 389 U.S. 971 (1967). The trial court further reasoned that December 1994 was the proper accrual date because at that time the plaintiff "knew or should have known" that raising the pool level would result in uncontrolled aquatic plant growth.

To the contrary, as revealed by the pleadings, the events that fix the Corps' alleged liability had not occurred by December 1994. The events that fixed the Corps' alleged liability occurred, at the earliest, in 1997. Therefore, this court perceives an error in the reasoning of the Court of Federal Claims. The trial court reasoned that accrual occurred when the Commission "knew or should have known" of "the damage that was going to occur as a result of raising the pool level." Final Decision, slip op. at 13. The correct standard recites that accrual occurs when the harmed party knows or should have known of their existence and "all events which fix the government's alleged liability have occurred." See Boling v. United States, 220 F.3d 1365, 1370 (Fed. Cir. 2000) ("In general, a takings claim accrues when all events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." (citing Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988))); see also Fallini v. United States, 56 F.3d 1378,

05-5031                                    10

1380 (Fed. Cir. 1995) ("As a general matter, a cause of action accrues when all the events have occurred that fix the defendant's alleged liability and entitle the plaintiff to institute an action."). The harm in this case, the uncontrolled hydrilla growth, did not occur (i.e., was not fixed) until well after the water level in Pool 3 reached its maximum height in December of 1994.

The trial court reasoned that the Corps was responsible only for "the taking of the right to drain water from the Black Lake into the Red River," not for uncontrolled aquatic growth. Final Decision, slip op. at 18. However, the uncontrolled aquatic growth was the harm that occurred as a consequence of the taking of the right to drain the lake. In the first place, that harm did not instantly occur when Pool 3 reached its maximum level. That December of 1994 event only set in motion the potential for future harm. That harm did not exist until much later.

When the damages from a taking only gradually emerge, e.g., as in recurrent flooding, a litigant may postpone a suit for a taking until "the situation becomes stabilized" and "the consequences of inundation have so manifested themselves that a final account may be struck." United States v. Dickinson, 331 U.S. 745, 749 (1947). Dickinson established the principle that, "when the government allows a taking of land to occur by a continuing process of physical events, plaintiffs may postpone filing suit until the nature and extent of the taking is clear." Fallini, 56 F.3d at 1381. Dickinson discouraged a strict application of accrual principles in unique cases involving Fifth Amendment takings by continuous physical processes. Applegate v. United States, 25 F.3d 1579, 1582

(Fed. Cir. 1994) (citing Dickinson, 331 U.S. at 749). This court followed the Supreme Court's Dickinson mandate in Applegate, and held that the gradual character of the natural erosion process to the beach-front properties south of the Cape Canaveral harbor made accrual of the landowner's claim uncertain. 25 F.3d at 1583. Likewise, in Banks v. United States, 314 F.3d 1304 (Fed. Cir. 2003), this court also applied the stabilization doctrine to another shoreline erosion case.

This court's predecessor, the United States Court of Claims, also held that a claim does not accrue until the claimant suffers damage. Terteling v. United States, 334 F.2d 250, 254 (Ct. Cl. 1964). Because some growth of hydrilla is normal, the damage in this case, which was uncontrolled overgrowth and the Corps refusal to reduce the water level, did not occur until January 1997. In 1994, when the Corps had not yet issued a final refusal, there was only the possibility or threat of damage or a taking. A possible future taking of property cannot give rise to a present action for damages. United States v. 3,218.9 Acres of Land, 619 F.2d 288 (3rd Cir. 1980). Thus, in this case, until the hydrilla had grown, and had grown to harmful levels, and the Corps refused to drain the lake to alleviate the harm caused by the overgrowth of hydrilla, damages were not "present," i.e. they were still unquantifiable and speculative. See Alder v. United States, 785 F.2d 1004 (Fed. Cir. 1986)(court affirming Claims Court's holding that ranchers' claim accrued in July of 1973 after they lost all grazing permits, and were obliged to discontinue ranching operations, and had no right to use access road across tribal lands, and their fee land had no market or mortgage

value). Until damages were quantifiable and present, the potential harm that could be caused by the hydrilla was only a threat. It did not become clear that the gradual process set in motion by the Corps had effected a permanent taking until the situation, i.e. the overgrowth of hydrilla, "stabilized" in 1997.

Thus, though the trial court correctly perceived that the harm in this case was the gradual emergence of uncontrolled aquatic growth, it erred when it fixed the accrual date at the time of the event that set this gradual growth problem in motion, i.e., the filling of pool 3, as opposed to the time the situation had "stabilized." See Final Decision, slip op. at 19. Because the harm manifested itself only gradually after 1994, and the nature and extent of the harm was not clear in 1994, the accrual date of the taking was later than December 1994.

The Commission could only conjecture about potential harms or the prospect that the Corps may agree to mitigate those harms when until they actually occurred. The Commission's calculation of damages of about eight million dollars in 1992 (before the trial court's erroneous accrual date) does not demonstrate, as the trial court mistakenly held, that "the damages in this case were not only foreseeable, but in fact foreseen." Rather, this calculation, which was apparently too low, shows not only that damage was a potential future occurrence but that early calculation of its extent was premature. Indeed, the Corps might have elected to avoid the damages altogether by allowing a drawdown, which would alleviate the overgrowth of hydrilla. Moreover, the record even disputes whether this premature guess has any validity in light of the competing allegation that damages may rise to almost thirty million dollars.

The trial court's decision is not consistent with <u>Dickinson</u>. The harm in this case did not stabilize until well after the first emergence of hydrilla.

Thus, this court concludes that the accrual date for the takings claim was no earlier than January 1997. The trial court erred in dismissing the Commission's claim as untimely filed. Therefore, on remand, the trial court need not further address equitable tolling of the Tucker Act, or a bar on the Commission's claim for failure to exhaust all possible administrative remedies. <u>See, e.g.</u>, <u>Martinez v. United States</u>, 333 F.3d 1295, 1318 (Fed. Cir. 2003).

## Conclusion

Therefore, the accrual of the Commission's alleged taking could not have occurred before January 2, 1997. This court finds, therefore, that the taking claim is not time-barred. This court does not reach the issue of equitable tolling under 28 U.S.C. § 2501. This court reverses and remands.

## COSTS

Each party shall bear its own costs.

## <u>REVERSED and REMANDED</u>

# United States Court of Appeals for the Federal Circuit

05-5031

NORTHWEST LOUISIANA FISH &
GAME PRESERVE COMMISSION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.


LOURIE, <u>Circuit Judge</u>, dissenting.

I respectfully dissent from the majority's conclusion that the statute of limitations had not run because the harm caused by aquatic growth did not stabilize until after December 1994. I do so because our case law holds that it is the act of the government that triggers the clock, not the time when the consequences of that act are fully felt. In my opinion, the Court of Federal Claims was correct in holding that the Commission "knew or should have known that raising the pool level would, in a short, fixed, period of time, result in a permanent taking of Black Lake due to uncontrolled aquatic growth," and therefore the Commission's claim was barred by the statute of limitations. <u>Final Decision</u>, slip op. at 19. Contrary to the majority's view that there was no act creating the hydrilla weed problem until January 1997, the government's impoundment of Pool 3 in December 1994 was the act that created the weed infestation, regardless when the consequences of that decision were felt. Because the government's act occurred more than six years before the Commission first filed suit in July 2001, the claim was barred

by the statute of limitations, 28 U.S.C. § 2501.

The majority opinion sets forth the relevant case law concerning the "stabilization" doctrine, concluding that "[b]ecause the harm manifested itself only gradually after 1993, and the nature and extent of harm was not clear in 1993, the accrual date of the taking was later than December 1994." In my view, that approach applies the "stabilization" doctrine of United States v. Dickinson, 331 U.S. 745 (1947) too broadly. The Supreme Court has held that Dickinson stands for the limited holding that the statute of limitations does not bar an action for a taking by flooding "when it was uncertain at what stage in the flooding operation the land had become appropriated to public use." United States v. Dow, 357 U.S. 17, 27 (1958). The Court of Claims and this court have adopted a similarly narrow interpretation of Dickinson and the meaning of "stabilization" in the takings context. We explained in Fallini v United States, 56 F.3d 1378 (Fed. Cir. 1995) that "the Supreme Court [has] 'more or less limited [Dickinson] to the class of flooding cases to which it belonged, when the landowner must wait in asserting his claim, until he knows whether the subjection to flooding is so substantial and frequent as to constitute a taking.'" Id. at 1381-82 (quoting Kabua v. United States, 546 F.2d 381, 384 (Ct. Cl. 1976)).

Our case law thus holds that "the 'obligation to sue' arises once the 'permanent nature' of the government action is evident, regardless of whether damages are 'complete and fully calculable.'" Goodrich v. United States, No. 05-5047, slip op. at 10-11 (Fed. Cir. Jan. 9, 2006) (citations omitted); see Boling v. United States, 220 F.3d 1365, 1371 (Fed. Cir. 2000) ("The contention that Dickinson stands for the proposition that the filing of a lawsuit can be postponed until the full extent of the damage is known

has been soundly rejected."); Fallini, 56 F.3d at 1382 ("[I]t is not necessary that damages from the alleged taking be complete and fully calculable before the cause of action accrues."); see also Delaware State College v. Ricks, 449 U.S. 250, 258 (1980) (holding that the proper focus in a claim accrual analysis "is upon the time of the [defendant's] acts, not upon the time at which the consequences of the acts become most painful.").

I believe that this case is unlike Dickinson and the other flooding cases because the Commission's claim is not based on a gradual taking resulting from continuing flooding, but rather on gradual harm caused by a singular discreet act: the taking of the right to drain water from Black/Clear Lake into Red River. Notwithstanding the majority's recitation of the facts, the permanent nature of the taking was nonetheless evident to the Commission when the government raised the level of Pool 3 to 95 feet M.S.L. in December 1994, and thus the takings claim accrued at that time.

Far from being "unquantifiable and speculative," as the majority contends, ante at 12, the aquatic growth problem caused by the existing hydrilla was an inevitable consequence of the government's act that was known to the Commission in December 1994. As early as 1988, the State of Louisiana Department of Transportation and Development ("State"), which the Commission has accepted as its "alter ego," made repeated contentions that raising the water level of Pool 3 would interfere with its ability to control aquatic growth in Black Lake. In 1992, the State took an additional step of calculating the cost of controlling aquatic weed growth resulting from the government's impoundment of Pool 3 to be $7,575,000 over the lifetime of the project, stating that "[t]his amount would be acceptable to the Department for mitigation of losses," and

requesting corrective action. Clearly, the Commission thought the harm was sufficiently stabilized in 1992 to propose a settlement that would have made it whole. In response, the government notified the Commission that it had no intention of altering its plan to raise the pool level to 95 feet M.S.L. However, even though the Commission knew of the harmful effects of raising Pool 3, the Commission waited until the consequences of the government's act were "most painful" before taking action. Fallini, 56 F.3d at 1383. That decision cannot change the accrual date of the statute of limitations.

The majority states that "[t]hough hydrilla had been discovered in 1993, it was believed killed by a drawdown in May of 1994. It was rediscovered again sometime in 1995, but it was not until 1996 that detailed studies showed it was spreading to an extent that it had become a problem." Ante at 4. However, contrary to the majority's view that the hydrilla seriously emerged for the first time in 1996, the Commission has conceded that the hydrilla problem returned when the government impounded Pool 3 in December 1994. The Commission's counsel represented to the trial court that, "in 1994, prior to raising the pool level to 95 feet M.S.L., the [Commission] was able to draw down Black/Clear Lake to address a problem with hydrilla, but that problem returned once the pool was elevated in December 1994 and the plaintiff could no longer draw down the Lake." Final Decision, slip op. at 7.

Because any uncertainty in December 1994 concerned the ultimate extent of the weed damage, not the permanent nature of the taking, I conclude that the government's act of impounding Pool 3 was sufficient to constitute a taking and hence accrue a takings claim. Accordingly, I respectfully dissent from the court's application of the stabilization doctrine to permit the Commission to litigate a claim that accrued more than

six years before it filed suit in the Court of Federal Claims.  I therefore would affirm the

judgment of that court.