NORTHWEST LOUISIANA FISH & GAME PRESERVE COMMISSION, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 02–1031L.

United States Court of Federal Claims.

Oct. 31, 2007.

William P. Crews, Jr., Natchitoches, LA, for plaintiff.

David F. Shuey, U.S. Department of Justice, Washington, DC, with whom was Ronald J. Tenpas, Acting Assistant Attorney General for defendant. Kathleen L. Doster, U.S. Department of Justice, of counsel.

## OPINION

FIRESTONE, Judge.

This case comes before the court on the defendant's motion, pursuant to Rule 12(c) of the Rules of the United States Court of Federal Claims ("RCFC"), for judgment on the pleadings. The defendant, the United States ("defendant" or "government"), contends that the claim filed by the plaintiff, Northwest Louisiana Fish and Game Preserve Commission ("Commission" or "plaintiff"), seeking damages from the government for an alleged taking of its ability to manage the Northwest Louisiana Game and Fish Preserve, should be dismissed under RCFC 12(b)(1) because the court lacks subject matter jurisdiction to hear the plaintiff's claim, and alternatively should be dismissed under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted.[1] The

---

1. The government's motion was originally filed on March 31, 2004. As discussed *infra*, in its motion, the government also argued that the plaintiff's complaint should be dismissed under RCFC 12(b)(1) because it was barred by the applicable statute of limitations. On October 29, 2004, this court granted the government's motion and dismissed the plaintiff's complaint on the grounds that the action was barred by the statute of limitations. *Nw. La. Fish & Game* *Pres. Comm'n v. United States,* 62 Fed.Cl. 760 (2004). Because the court held that the plaintiff's claim was time-barred, it did not reach any of the government's other arguments. On May 2, 2006, the United States Court of Appeals for the Federal Circuit reversed and remanded this decision, finding that the alleged taking accrued in 1997 and thus that the plaintiff's claim was not time-barred. *Nw. La. Fish & Game Pres. Comm'n v. United States,* 446 F.3d 1285, 1290

plaintiff seeks approximately $26 million to cover the cost of curative measures the plaintiff asserts were made necessary by damage to its property resulting from the Red River Navigation Project, which was authorized by the government in 1968 to improve the navigability of the Red River. For the reasons set forth below, the government's motion for judgment on the pleadings is **GRANTED-IN-PART** and **DENIED-IN-PART**.

## BACKGROUND

The background facts of this case were set forth in significant detail in this court's prior decision, *Northwest Louisiana Fish & Game Preserve Commission v. United States,* 62 Fed.Cl. 760, 761–63 (2004), and in the Federal Circuit's decision, *Northwest Louisiana Fish & Game Preserve Commission v. United States,* 446 F.3d 1285, 1286–89 (Fed.Cir. 2006). The specific facts relevant to this decision, taken from the plaintiff's complaint and from additional exhibits filed by both parties with their respective briefs, are set forth below.

### I. History of the Northwest Louisiana Game and Fish Preserve

The Northwest Louisiana Game and Fish Preserve ("Preserve") was established by the Louisiana Legislature in 1926 and was initially placed under the control of the Louisiana Conservation Commission. Act 191 of 1926. The Preserve was initially comprised of three artificially created lakes, Black Lake, Clear Lake, and Saline Lake, and the surrounding lands, and was developed for recreation and for the preservation of wildlife and fisheries. *Id.* After the creation of the Preserve, the state constructed a dam, known as the Allen Dam, to keep water from draining from the lakes. In 1928, the Preserve was placed under the control of the Louisiana Department of Conservation. Act 69 of 1928. In 1946, the Louisiana Legislature created the Northwest Louisiana Game and Fish Preserve Commission[2] and granted it the au-

thority to "administer the [Preserve] and make rules and regulations for the control thereof." Act 120 of 1946. While the Commission was originally placed under the supervision of the Department of Wild Life and Fisheries, the Commission was vested with the "right, power and authority to sue and be sued as a subdivision of the State" and to "purchase, lease or expropriate all property necessary to the erection and maintenance of the [Preserve]." *Id.* The state of Louisiana retained title to the lakes themselves, as well as the land surrounding and under the lakes. In 1976, the Legislature withdrew control over Saline Lake from the Commission and placed the Commission under the control of the Louisiana Wildlife and Fisheries Commission. Act 105 of 1976.

In 1982, the Allen Dam failed. Compl. at ¶ 15. To prevent complete drainage of Black Lake and Clear Lake ("Black/Clear Lake"), the Louisiana Department of Transportation and Development constructed a new control structure, known as the Black/Clear Lake Dam ("Dam"). Construction of this structure was completed in 1990. The Dam was intended to hold the water surface elevation of Black/Clear Lake at 99.5 feet Mean Sea Level ("M.S.L."). The Dam consists of a 2,380-foot long earthen-fill embankment at an elevation of 116.0 feet M.S.L., and a concrete spillway consisting of a 350-foot long uncontrolled concrete weir with a crest elevation of 99.5 feet M.S.L. and four sluice gates. The sluice gates were designed to allow water to be released below 99.5 feet M.S.L. from Black/Clear Lake into the Saline Bayou, which connects Black/Clear Lake to the Red River. In order to lower the elevation of Black/Clear Lake below 95.0 feet M.S.L., the elevations of the Saline Bayou and the Red River were required to be lower than the Ordinary High Water Mark ("OHWM") of 96.1 feet M.S.L.

After construction of the Dam, water was periodically released from Black/Clear Lake

---

(Fed.Cir.2006). The court now considers the remaining arguments presented in the government's motion for judgment on the pleadings.

2. While all relevant state legislation refers to the Commission as the "Northwest Louisiana Game and Fish Preserve Commission," the plaintiff re-

fers to itself as the "Northwest Louisiana Fish and Game Preserve Commission." For the purposes of this opinion, the court will use the name that was used by the plaintiff when filing its complaint.

through the sluice gates into the Saline Bayou to lower the water level of Black/Clear Lake, which prevented the growth of unwanted aquatic vegetation in Black/Clear Lake. Virginia Van Sickle, of the State of Louisiana Department of Wildlife and Fisheries, wrote in a letter to the Louisiana Department of Transportation and Development that "[d]rawdowns on Black Lake average one per every three years, with certain years having successive mid-June to mid-January and Labor Day to mid-January drawdowns to control various types of nuisance aquatic growth." Letter from Van Sickle to Patterson, October 14, 1988. Black/Clear Lake was most recently drawn down in the fall of 1994, when the level of the lake was lowered by eight feet. Pl.'s Ex. B at 1.

## II.   The Red River Navigation Project

In 1968, Congress authorized the Red River Navigation Project ("Project") with the intent of improving navigation along the Red River. River and Harbor Act of 1968, Pub.L. No. 90–483, § 101, 82 Stat. 731 (1968). Shortly thereafter, the United States Army, Corps of Engineers ("COE"), entered into an agreement with the Red River Waterway Commission ("RRWC") to begin construction on the Project with the goal of improving the navigability of the Red River. The Project provided for the construction of a nine-foot by 200–foot navigation channel, to extend approximately 236 miles from the junction of the Red River with the Mississippi River, to Old River, and upriver to Shreveport, Louisiana. The Project aimed to increase water depths along the Red River with the construction of five locks and dams at various points along the river to maintain pools at specific elevations. The OHWM of the Red River at St. Maurice (where the Red River and the Saline Bayou meet) is 96.1 feet M.S.L.

The dispute in this case involves Lock and Dam 3 ("L & D 3") and its adjacent pool, Pool 3. L & D 3 is located sixteen miles upstream from Boyce, Louisiana, and Pool 3 extends 52.3 miles upriver, from L & D 3 to Lock and Dam 4. Black/Clear Lake connects to the Red River through the Saline Bayou at Pool 3. The plans for L & D 3 were approved in April 1984. Construction of L & D 3 began on April 20, 1988 and was completed on March 12, 1993. Compl. at ¶ 11. Pool 3 had an initial elevation of 85.5 feet M.S.L. on December 9, 1991; over the next three years, the elevation was gradually increased to 94.5 feet M.S.L., which was reached on December 9, 1994.[3]

Once construction of Pool 3 was complete, Black/Clear Lake could only be lowered by a maximum of 4.5 feet, which the plaintiff contends is not sufficient to allow it to prevent unwanted aquatic growth. Pl.'s Ex. B at 1. The plaintiff contends that the increase in the elevation of Pool 3 has limited the plaintiff's ability to control the growth of unwanted vegetation in Black/Clear Lake, because the plaintiff can no longer utilize the Black/Clear Lake Dam to drain Black/Clear Lake to a level sufficient to manage aquatic growth. In particular, the plaintiff argues that the increased growth of hydrilla and coontail, types of aquatic weeds, has rendered the northern portion of Black/Clear Lake useless.[4] The plaintiff also asserts that, because of its inability to control weed growth, portions of Black/Clear Lake are now inaccessible by boat, and the plaintiff's ability to manage fish populations has been impaired as a result. Finally, the plaintiff asserts that, due to the Project, there has been an increase in "undesirable water levels," Compl. at ¶ 19, and that Black/Clear Lake and the land surrounding the lake has experienced more frequent flooding, which in its briefs the plaintiff contends stems at least

---

**3.**   The elevation of Pool 3 eventually leveled out at approximately 95.0 feet M.S.L. in or about January 1995.

**4.**   Black/Clear Lake was surveyed in October 2003 for the presence of aquatic plants. The results of the survey indicated that the northwest portion of the Lake was severely infested with two species of vegetation: *Cabomba caroliniana*

and *Hydrilla verticillata*. Pl.'s Ex. Q at 3. The biologist who completed the survey recommended that the area of the Lake between four feet and eight feet (which can no. longer be treated by drawing down the Lake) be treated during a drawdown with herbicides. *Id.* It is not clear whether the Lake has ever been treated with herbicides.

in part from the "backwater effect" from Pool 3.

## III. Present Litigation

In February 1997, the plaintiff filed suit in the Tenth Judicial District Court of Natchitoches Parish, Louisiana against the RRWC, alleging that the RRWC's decision to raise the water level in Pool 3 constituted inverse condemnation under the Louisiana Constitution. The RRWC impleaded the COE as a third party defendant. The case was then removed to the United States District Court for the Western District of Louisiana, which granted the RRWC's motion for summary judgment on July 28, 1999. *Nw. La. Fish & Game Pres. Comm'n v. Red River Waterway Comm'n,* No. 97–1984, slip op. at 9 (W.D.La. July 28, 1999). The plaintiff's claims against the government under the Federal Tort Claims Act were subsequently dismissed as barred by the statute of limitations under 28 U.S.C. § 2401(b). *Nw. La. Fish & Game Pres. Comm'n v. United States,* No. 01–1264, Report and Recommendation at 11 (Apr. 1, 2002). The Western District ordered that any claim the plaintiff might have under the Tucker Act, 28 U.S.C. § 1491, be transferred to this court. *Nw. La. Fish & Game Pres. Comm'n v. United States,* No. 01–1264, slip op. at 1 (W.D. La. June 11, 2002). On August 22, 2002, this court received the plaintiff's case.

The government first filed a motion for judgment on the pleadings on March 31, 2004, arguing, in addition to the contentions currently before the court, that the plaintiff's claim should be barred by the statute of limitations. On October 29, 2004, the court granted the government's motion, holding that the plaintiff's claim accrued no later than December 1994, when the level of Pool 3 reached its maximum height, and accordingly that the claim was time-barred. *Nw. La. Fish & Game Pres. Comm'n,* 62 Fed.Cl. 760. The plaintiff appealed the decision, and it was reversed by the Federal Circuit on May 2, 2006. *Nw. La. Fish & Game Pres. Comm'n,* 446 F.3d 1285. The Federal Circuit determined that the accrual date of the plaintiff's claim was no earlier than January 1997, the month in which the plaintiff's request that Pool 3 be lowered so that it could drain Black/Clear Lake was denied by the COE. *Id.* at 1292. The court found that the harm suffered by the plaintiff (uncontrolled hydrilla growth) was not fixed until a substantial time after the water level in Pool 3 reached its maximum height, and therefore that the damages potentially suffered by the plaintiff were not quantifiable until the hydrilla had grown to harmful levels. *Id.* at 1291.

Subsequently, this court established a supplemental briefing schedule to address the remaining issues in the case. Each party filed its initial supplemental brief in April 2007. The court has determined that oral argument is not necessary.

## DISCUSSION

### I. Standard of Review

This matter comes before the court on the government's motion for judgment on the pleadings pursuant to RCFC 12(c), which states that "[a]fter the pleadings are closed, but within such time as not to delay the trial, any party may move for judgment on the pleadings." "The legal standard applied to evaluate a motion for judgment on the pleadings is the same as that for a motion to dismiss." *Peterson v. United States,* 68 Fed. Cl. 773, 776 (2005).

The government first contends that dismissal is required under RCFC 12(b)(1) because this court is without jurisdiction to hear the present dispute. Specifically, the government argues that the plaintiff has failed to identify any property interest that was taken by the government and that the plaintiff's claims sound in tort, and accordingly that the plaintiff does not have standing to bring a claim against the government. In considering a motion challenging jurisdiction, the court construes allegations in the complaint most favorably to the plaintiff, resolving ambiguities in its favor. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The court may look beyond the pleadings and "inquire into jurisdictional facts" to determine whether jurisdiction exists. *Rocovich v. United States,* 933 F.2d 991, 993 (Fed.Cir.1991). RCFC 12(c)

provides that if "matters outside the pleadings are presented to and not excluded by the court, the motion shall treated as one for summary judgment." In most circumstances this provision "does not apply to a motion made under Rule 12(b)(1) to dismiss for lack of jurisdiction over the subject matter, which may not be converted into a motion for summary judgment even though the court in considering it may address matters outside the pleadings." *Reed Island–MLC, Inc. v. United States,* 67 Fed.Cl. 27, 32 (2005) (citing *Toxgon Corp. v. BNFL, Inc.,* 312 F.3d 1379, 1383 (Fed.Cir.2002)). However, a motion to dismiss for lack of subject matter jurisdiction *may* be converted into a motion for summary judgment "when the jurisdictional question is inextricably intertwined with the merits of the case." *Thoen v. United States,* 765 F.2d 1110, 1114 (Fed.Cir.1985).

In the present case, the court has been presented with matters outside the pleadings, namely documents offered by the plaintiff and the government in the appendices to their respective briefs. All of these documents are public records, including correspondence to or from various state agencies and the COE, information gathered throughout the Red River Navigation Project, and reports completed on behalf of state agencies. The court will rely on these matters to the extent that they allow the court to determine whether it has jurisdiction over this case.

In the alternative, the government contends that the plaintiff has failed to state a claim upon which relief could be granted as required by RCFC 12(b)(6). When evaluating a motion for judgment on the pleadings that relies on the standards set forth in RCFC 12(b)(6), if "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment." RCFC 12(c). As discussed above, the court has been presented with matters outside of the pleadings by both parties. Accordingly, the government's challenge of the plaintiff's claims on RCFC 12(b)(6) grounds will be treated as a motion for summary judgment.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. 2505. The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact; once this burden is met, in order to defeat summary judgment, the non-moving party must present evidence which demonstrates such a genuine issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Long Island Sav. Bank, FSB v. United States,* 503 F.3d 1234, 1243–44 (Fed.Cir.2007). In determining whether a genuine issue of material fact exists, the court must consider the evidence and resolve all doubts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Am. Pelagic Fishing Co. v. United States,* 379 F.3d 1363, 1371 (Fed.Cir.2004).

## II. The Court Does Not Have Jurisdiction over the Plaintiff's Claims Sounding in Tort.

The government contends that this court lacks jurisdiction over the plaintiff's claims because the claims sound in tort and do not merit treatment under takings law. The government asserts that the plaintiff has not alleged any physical invasion of its property by the government, which the government argues is a required element of a takings claim. Specifically, the government argues that the plaintiff's complaint contains numerous allegations of tortious conduct, including trespass and nuisance, and that the complaint fails to identify any compensable property interest that was physically invaded or taken as a result of the government's actions.

The Court of Federal Claims is a court of limited jurisdiction, *Jentoft v. United States,*

450 F.3d 1342, 1349 (Fed.Cir.2006) (citing *United States v. King,* 395 U.S. 1, 3, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)), and under the Tucker Act, 28 U.S.C. § 1491 (2000), may "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). It is well-settled, however, that the Tucker Act's jurisdictional grant does not extend to cases sounding in tort. *See Id. See also Keene Corp. v. United States,* 508 U.S. 200, 214, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993); *Jentoft,* 450 F.3d at 1349–50; *Edelmann v. United States,* 76 Fed.Cl. 376, 380 (2007).

In its amended complaint, the plaintiff alleges that the government's actions at issue in this case constitute a "continuing trespass and/or continuing nuisance." Compl. at ¶ 19. The plaintiff also asserts that the government committed "improper and unlawful acts" which resulted in losses to the plaintiff, including the "loss of use of lands and waters involved, diminution in market value of said lands and/or waters, an interference with or destruction of the use of said lands for wildlife habitat and other recreational purposes, together with other specials [sic] or consequential damages including costly curative work necessitated thereby." Compl. at ¶ 20. Finally, the plaintiff asserts that the actions of the government constitute a "continuing tort." Compl. at ¶ 27.

This court has no jurisdiction over the plaintiff's claims regarding a continuing trespass or continuing nuisance. These claims sound in tort, and tort claims are expressly excluded from this court's jurisdiction under the Tucker Act. 28 U.S.C. § 1491(a)(1). In addition, the plaintiff's contentions that the government's action in constructing Pool 3 was "improper and unlawful" are allegations that the government's conduct was tortious and such contentions are not proper in the context of a takings claim. "[I]n a takings case we assume that the underlying governmental action was lawful, and we decide only whether the governmental action in question constituted a taking for which compensation must be paid." *Rith Energy, Inc. v. United States,* 270 F.3d 1347, 1352 (Fed.Cir.2001). The Federal Circuit also held that "to the extent the plaintiff claims it is entitled to prevail *because* the agency acted in violation of statute or regulation ... [the plaintiff does not have] a right to litigate that issue in a takings action." *Rith Energy, Inc. v. United States,* 247 F.3d 1355, 1366 (Fed.Cir.2001) (emphasis in original). Because this court does not have jurisdiction over the plaintiff's claims sounding in tort, the tort claims included in Counts 19, 20, and 27 of the plaintiff's amended complaint, and any other allegations sounding in tort included in the plaintiff's amended complaint or pleadings, must be dismissed.

### III. The Plaintiff Has Standing to Maintain a Takings Claim.

The government contends that any remaining takings claim should be dismissed pursuant to RCFC 12(b)(1) because the plaintiff lacks standing to bring this suit. Specifically, the government alleges that the plaintiff has not identified a property interest of which it is the owner that was "taken" by the government as required by RCFC 9(h)(7), which requires that a plaintiff bringing a takings claim identify, in the pleadings, "the specific property interest that plaintiff contends has been taken by the United States." The government asserts that it is well-settled that only the owner of the property on the date of a taking may bring a takings claim in this court. *See, e.g., Cavin v. United States,* 956 F.2d 1131, 1134 (Fed.Cir.1992). The government argues that the plaintiff does not hold title to any of the lands comprising the Preserve,[5] including the bed and bottom of Black/Clear Lake and the lake itself, asserting that the state of Louisiana holds the title to Black/Clear Lake and the lands contiguous to the lake. Furthermore, the government argues that, to the extent the plaintiff seeks compensation for the taking of its ability to manage the Preserve, such an ability does

---

**5.** According to Act 69 of 1928, the lands comprising the Preserve include "all of the land lying within one quarter of a mile on the edge of the water at high water mark in said lakes."

not constitute a property right for the purposes of the Fifth Amendment. Accordingly, the government contends that the plaintiff's claim should be dismissed for lack of subject matter jurisdiction.

The plaintiff concedes that it does not hold title to any of the property at issue. However, the plaintiff argues that, as an agency or subdivision of the state of Louisiana, it effectively functions as an "alter ego" of the state. In addition, the plaintiff contends that it has been vested with the power to "sue and be sued" as a subdivision of the state, Act 308 of 1948, and that the Preserve operates under the plaintiff's administration and control. The plaintiff argues that its property interest stems from the legal right of enforcement and adjudication of issues related to the Preserve, and that whether the plaintiff holds title to the physical property comprising the Preserve is irrelevant.[6] Relying on *Kaiser Aetna v. United States,* 444 U.S. 164, 178, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), the plaintiff asserts that an interest involving a legally enforceable right is considered a property interest within the meaning of the takings clause, and that its legally enforceable right to manage the Preserve has been taken by the government.

Specifically, the plaintiff contends that this court has determined that state entities charged with the maintenance of state property have a sufficient property interest to bring a takings claim against the government. In *County of Sarpy, Nebraska v. United States,* 181 Ct.Cl. 666, 386 F.2d 453 (1967), the court determined that the plaintiff, a county, was entitled to compensation for the closing of a portion of a county road, holding that "the appropriate governmental unit, such as a county, having the responsibil-

ity of constructing, maintaining, or preserving highways, has a sufficient property interest to maintain an action when one of its highways is taken." *Id.* at 457. The plaintiff argues that, similarly in this case, because the plaintiff has the statutory right to enforce and adjudicate matters pertaining to Black/Clear Lake, it has a sufficient property interest in Black/Clear Lake to maintain a takings claim.

■ The Court of Federal Claims has jurisdiction, under the Tucker Act, to hear claims for money damages against the United States. However, the Tucker Act simply confers jurisdiction on this court; a plaintiff must also identify a separate money-mandating statute upon which to base a claim for damages. *See Todd v. United States,* 386 F.3d 1091, 1094 (Fed.Cir.2004); *Tippett v. United States,* 185 F.3d 1250, 1254 (Fed.Cir. 1999) ("[T]he plaintiff must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States." (quoting *James v. Caldera,* 159 F.3d 573, 580 (Fed. Cir.1998))). In determining jurisdiction, this court must ask "only whether the plaintiff is within the class of plaintiffs entitled to recover under the statute if the elements of a cause of action are established." *Greenlee County v. United States,* 487 F.3d 871, 876 (Fed.Cir.2007). *See also Brodowy v. United States,* 482 F.3d 1370, 1375 (Fed.Cir.2007) ("Where plaintiffs have invoked a money-mandating statute and have made a non-frivolous assertion that they are entitled to relief under the statute, we have held that the Court of Federal Claims has subject-matter jurisdiction over the case.").[7] Here, the plaintiff has invoked a money-mandating Constitutional provision, the Fifth Amend-

---

6. The plaintiff does contend, however, that because it functions as a subdivision of the state, "there is no need for a subdivision of the state to be named on a title to property which is owned by the state." Pl.'s Supp. Br. at 16 fn. 1. Therefore, the plaintiff argues that ownership of property comprising the Preserve should not be an issue in this case.

7. The Supreme Court recently opined as to the requirements of a pleading:

   While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factu-

al allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than just labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true. *Bell Atlantic Corp. v. Twombly,* — U.S. —, —, 127 S.Ct. 1955, 1959, 167 L.Ed.2d 929 (2007).

ment, and has made a non-frivolous assertion that it is entitled to relief under the Fifth Amendment. The plaintiff has identified a property interest in managing Black/Clear Lake on behalf of the state. The plaintiff fits within the criteria for ownership adopted by the Court of Claims in *County of Sarpy*. Like the County in that case, the plaintiff in this case is charged with the maintenance of property, the Preserve, for which the state holds title. Accordingly, this court has subject matter jurisdiction over the plaintiff's takings claims.

**IV. Portions of the Plaintiff's Alleged Property Interest Are Subservient to the Navigational Servitude.**

■ Under the Fifth Amendment, private property cannot "be taken for public use, without just compensation." U.S. Const. amend. V. The Supreme Court has held that a taking can fall into one of two categories: a physical taking or a regulatory taking. *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1014–15, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). In this case, the plaintiff alleges a physical taking, which is a "permanent physical occupation authorized by the government." *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). "Where the government authorizes a physical occupation of property (or actually takes title) the Takings Clause generally requires compensation." *Yee v. City of Escondido,* 503 U.S. 519, 522, 112 S.Ct. 1522, 118 L.Ed.2d 153

(1992). In order to successfully bring a takings claim, a plaintiff must first identify the property interest allegedly taken. If a property interest exists for the purposes of the Fifth Amendment, the court must then determine whether a taking actually occurred. *Members of Peanut Quota Holders Ass'n. v. United States,* 421 F.3d 1323, 1330 (Fed.Cir. 2005). "In a physical takings case, the inquiry is limited to whether the claimant can establish a physical occupation of his property by the Government." *Applegate v. United States,* 35 Fed.Cl. 406, 414 (1996). Where, as here, the taking involves a project aimed at improving navigation, additional issues are raised. In particular, the court must first consider the impact of the navigational servitude on the property interest at issue.

■ The government contends that any compensation sought by the plaintiff for the alleged taking of the plaintiff's ability to manage Black/Clear Lake is barred by the navigational servitude.[8] The navigational servitude doctrine is a long-standing concept derived from the principle that all navigable waters in the United States are considered "public property" and are under the "exclusive control of the federal government." *Owen v. United States,* 851 F.2d 1404, 1408 (Fed.Cir.1988) (en banc). The Supreme Court has established that the power granted to the United States under the Commerce Clause, U.S. Const. art. 1, § 8, cl. 3, includes the ability to regulate navigation, and that that ability is dominant to any other property interest existing in a navigable body of water

---

8. In its April 6, 2007 Supplemental Brief, the plaintiff argued for the first time that the government waived the ability to raise the navigational servitude as a defense because it was not affirmatively pled in the government's Answer. Pl.'s Supp. Br. at 40. The plaintiff asserts that, pursuant to RCFC 8(c), failure to plead an affirmative defense constitutes a waiver of that defense. The government argues that, assuming that the navigational servitude is considered to be an affirmative defense, it did not waive the ability to raise the navigational servitude in response to the plaintiff's claims because a waiver "is not effective absent unfair surprise or prejudice." *First Annapolis Bancorp, Inc. v. United States,* 75 Fed. Cl. 280, 288 (2007). The government contends that, because it first raised the navigational servitude in its original Motion for Judgment on the Pleadings, filed three years ago, and because the plaintiff responded to the navigational servitude

argument in its initial opposition brief, the plaintiff has not been unfairly surprised or prejudiced by the government's arguments invoking the navigational servitude. The government is correct. The plaintiff has had sufficient time to respond to the government's arguments regarding the navigational servitude, and has responded in a complete and detailed manner. *See* Pl.'s Opp. to Def.'s Mot. at 36–38; Pl.'s Supp. Br. at 36–40. An affirmative defense that is not pled as prescribed is not waived absent unfair surprise or prejudice. *See Caldera v. Northrop Worldwide Aircraft Servs., Inc.,* 192 F.3d 962, 970 (Fed.Cir. 1999) (discussing Fed.R.Civ.P. 8(c), which is identical to RCFC 8(c)); *First Annapolis Bancorp,* 75 Fed.Cl. at 288. Accordingly, the government's invocation of the navigational servitude in its *Motion for Judgment on the Pleadings is* allowed.

and the bed of that body of water below the OHWM. As the Court has explained:

> This power to regulate navigation confers upon the United States a "dominant servitude," which extends to the entire stream and the stream bed below the ordinary high-water mark. The proper exercise of this power is not an invasion of any private property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject. *United States v. Chicago, M., St. P. & P.R. Co.,* 312 U.S. 592, 596–97[, 61 S.Ct. 772, 85 L.Ed. 1064] (1941).

*United States v. Rands,* 389 U.S. 121, 123, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967) (some citations omitted). Based on this precedent, the Federal Circuit has held that "upon the determination of Congress to improve navigation, the navigational servitude defines the appropriate boundaries within which the United States can assert its power to supersede private ownership interests without creating an obligation to pay just compensation under the Eminent Domain Clause of the Fifth Amendment." *Owen,* 851 F.2d at 1408. However, no court has held that "the navigational servitude creates a blanket exception to the Takings Clause whenever Congress exercises its Commerce Clause authority to promote navigation." *Kaiser Aetna v. United States,* 444 U.S. 164, 172, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). For example, "the government may be liable for a taking when its activities to improve navigation 'result in erosion to land above or outside' of the navigational servitude." *Banks v. United States,* 68 Fed.Cl. 524, 532 (2005) (quoting *Owen,* 851 F.2d at 1412). Similarly, the government can be held liable for the flooding of fast lands located beyond the beds of navigable rivers. *See, e.g., Baskett v. United States,* 8 Cl.Ct. 201, 209 (Ct.Cl.1985); *Tri–State Materials Corp. v. United States,* 213 Ct.Cl. 1, 550 F.2d 1, 5 (1977); *Goose Creek Hunting Club, Inc. v. United States,* 207 Ct.Cl. 323, 518 F.2d 579, 583 (1975).

■ The government first asserts that the Red River Navigation Project, and in particular the raising of the level of Pool 3 to 95.0 feet M.S.L., was undertaken with the goal of improving the navigability of the Red River. The government characterizes the plaintiff's alleged loss as a loss of the ability to make releases from Black/Clear Lake into the Saline Bayou, and ultimately the Red River, and argues that the plaintiff has no compensable property interest in the flow of the Red River or the Saline Bayou, nor in any ability dependent on that flow.

The government, relying on numerous federal court decisions, contends that, while the navigational servitude extends only to the navigable stream and stream bed below the OHWM, *it also precludes any claim for compensation based on the loss of an ability to utilize a navigable stream* below the OHWM. The Supreme Court articulated this concept in *United States v. Willow River Power Co.,* 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101 (1945), in which the Court rejected a claim for compensation from a power company for the alleged taking of the ability to produce power. The Court held that, while the plaintiff had an "economic interest" in the flow of the river, that economic interest could not be considered a "property right" for the purposes of the Fifth Amendment. The Court found that a plaintiff could be compensated for the taking of an "economic interest" only if that interest was legally protected, stating:

> It is clear, of course, that a head of water has value and that the Company has an economic interest in keeping the St. Croix at the lower level. But not all economic interests are "property rights"; only those economic advantages are "rights" which have the law back of them, and only when they are so recognized may courts compel others to forbear from interfering with them or to compensate for their invasion.... Such economic uses are rights only when they are legally protected interests. *Whether they are such interests may depend* on the claimant's rights in the land to which he claims the water rights to be appurtenant or incidental; *on the navigable or non-navigable nature of the waters from which he advantages;* on the substance of the enjoyment thereof for which

he claims legal protection; on the legal relations of the adversary claimed to be under a duty to observe or compensate his interests; *and on whether the conflict is with another private riparian interest or with a public interest in navigation.*

*Id.* at 502–03, 65 S.Ct. 761 (emphasis added). *See also Rands,* 389 U.S. at 124–25, 88 S.Ct. 265 (holding that the government was not required to compensate property owners for lost value of land that was used as a port site); *United States v. Twin City Power Co.,* 350 U.S. 222, 225, 76 S.Ct. 259, 100 L.Ed. 240 (1956) ("[T]he landowner here seeks a value in the flow of the stream, a value that inheres in the Government's servitude and one that under our decisions the Government can grant or withhold as it chooses."); *Borough of Ford City v. United States,* 345 F.2d 645, 653 (3rd Cir.1965) (denying the plaintiff's claim for compensation for the inability to utilize gravity flow sewer system after construction of lock and dam *in a navigable river*), *cert. denied,* 382 U.S. 902, 86 S.Ct. 236, 15 L.Ed.2d 156 (1965); *City of Eufaula v. United States,* 313 F.2d 745, 747 (5th Cir.1963) (holding that cities were not entitled to compensation for being prohibited from dumping raw sewage into a river); *City of Demopolis v. United States,* 167 Ct.Cl. 94, 334 F.2d 657, 659 (1964) (holding that the plaintiff was not entitled to compensation for the construction of a sewage treatment plant for a lake made necessary by the construction of a dam in a navigable river). Here, the government argues that the plaintiff's property interest is dependent on the level of the Red River and the use of the Red River to draw down Black/Clear Lake, and accordingly that this interest is subservient to the government's interest in improving navigation and the plaintiff's claim based on that interest must be dismissed.

The plaintiff contends that the navigational servitude does not bar its claim because the navigational servitude does not extend to the Preserve. Specifically, the plaintiff argues that the navigational servitude does not extend to any land or property outside of the riverbed itself, and accordingly that the plaintiff is entitled to compensation related to damage to Black/Clear Lake and the surrounding lands. The plaintiff relies on *Coo-*

*per v. Louisiana Department of Public Works,* 03–1074, 870 So.2d 315 (La.App. 3 Cir. 3/3/04); in which landowners of property along a creek filed suit against the government for flooding resulting from the raising of the level of a navigational pool by nearly thirteen feet. The Louisiana Court of Appeal determined that the creeks along which the plaintiffs' property was situated were not navigable and were thus not subject to the navigational servitude. *Id.* at 334. The plaintiff contends that, similarly, because Black/Clear Lake is not navigable, its property interest in maintaining the Lake should not be subject to the navigational servitude. The plaintiff also relies on *Tri–State Materials,* 213 Ct.Cl. 1, 550 F.2d 1, which involved a claim for damages that resulted from the hindrance of natural drainage from fast lands owned by the plaintiff. The Court of Claims determined that the plaintiff's mine, which was located outside the bed of a navigable river, was damaged by subflooding due to a raised water level in the river. *Id.* at 5, 550 F.2d 1. The court accordingly determined that the navigational servitude could not be applied by the government, and awarded the plaintiff damages for the flooding of its property. The plaintiff argues that, because its property was damaged due to the hindrance of its ability to overflow into the Red River, it should similarly be awarded damages for the flooding of its property.

Furthermore, the plaintiff makes a number of allegations regarding damage to the lands comprising the Preserve and the flooding of Black/Clear Lake that the plaintiff contends is caused by the higher water level in Pool 3. *See* Pl.'s Opp. to Def.'s Mot. at 9 ("plaintiff's land contiguous to the Lake had been damaged by flood waters caused by the inability to control the water level of the Black/Clear Lake"); Pl.'s Opp. to Def.'s Mot. at 33 ("Black/Clear Lake has been damaged by an increased water table, which becomes recurrent flooding when it rains"); Pl.'s Supp. Br. at 7 ("plaintiff has experienced a drastic increase in land flooding from the Lake as a result of the raising of the water level of Pool 3"); Pl.'s Supp. Br. at 33 (characterizing the damage as "an invasion of the property by a raised water table and the backwater effect from Pool 3").

**A. To the Extent the Plaintiff Asserts a Taking of the Ability to Drain Black/Clear Lake into the Red River, that Interest Is Subservient to the Navigational Servitude.**

The government's power to regulate navigation clearly supersedes any property interest claimed in the entire navigable stream and the stream bed below the ordinary high-water mark. *See, e.g., Rands,* 389 U.S. at 123, 88 S.Ct. 265. Furthermore, the Supreme Court has on numerous occasions held that a property owner's use or value that "arises from access to, and use of, navigable waters" is subject to the navigational servitude. *Id.* at 124–25, 88 S.Ct. 265; *see also Kaiser Aetna,* 444 U.S. at 177, 100 S.Ct. 383; *Twin City Power Co.,* 350 U.S. at 225, 76 S.Ct. 259; *Willow River Power Co.,* 324 U.S. at 503, 65 S.Ct. 761. Other courts have employed similar reasoning. *See, e.g., Borough of Ford City,* 345 F.2d at 653; *City of Eufaula,* 313 F.2d at 747; *City of Demopolis,* 334 F.2d at 659. Therefore, the government is correct that, to the extent the plaintiff bases its takings claim on the ability to drain from Black/Clear Lake into the Red River, which requires the elevation of the Red River to be below a certain level, the plaintiff's property interest is subservient to the navigational servitude.

The plaintiff's argument that the navigational servitude does not extend to lands outside of the riverbed, and its reliance on *Cooper,* are misplaced with regard to its property interest in the ability to drain Black/Clear Lake into the Saline Bayou, and ultimately into the Red River. Here, the plaintiff seeks damages for the alleged taking of its ability to drain Black/Clear Lake to control aquatic growth. This ability is dependent on the flow and the level of the Red River, and the characteristics of the Red River entirely within the riverbed and below the OHWM. In *Cooper,* the court awarded damages for the flooding of fast lands that were owned by the plaintiffs and located along a navigable river. The plaintiff does not seek damages for the flooding of fast-lands, but instead for the taking of the ability to drawdown Black/Clear Lake. Accordingly, *Cooper* does not apply to the plaintiff's claim.

Similarly, the plaintiff's reliance on *Tri–State Materials* is inapposite. In *Tri–State Materials,* the court determined that the plaintiff was entitled to compensation because its property, located outside the riverbed, was flooded as a result of action taken by the government to raise the water level of a navigable river. The court rejected the government's invocation of the navigational servitude for two reasons, stating:

> First, the lands at issue are not part of the bed of a navigable stream and are, therefore, outside the normal scope of the navigational servitude. Second, *since the value claimed to have been taken does not derive from access to or use of a navigable stream,* the navigational servitude does not serve to limit the amount of damages.

*Tri–State Materials,* 550 F.2d at 5–6 (emphasis added). The plaintiff apparently seeks compensation for the taking of its ability to draw down Black/Clear Lake, which, in contrast to the situation in *Tri–State Materials,* is a value that *does* "derive from access to or use of a navigable stream." The plaintiff's ability to use the Dam to drain water from Black/Clear Lake was dependent on the level of the Red River and the Saline Bayou being below the OHWM. The level of the Red River at Pool 3 was raised as part of the Red River Navigation Project, which was implemented with the goal of improving the Red River's navigability. Accordingly, under the test established by the Supreme Court in *Willow River Power Co.,* 324 U.S. at 502–03, 65 S.Ct. 761, which has been consistently held to bar claims in which the property interest is dependent on the use of a navigable waterway, the plaintiff's property interest in drawing down Black/Clear Lake by releasing water into the Red River arose from access to, and use of, the Red River, a navigable body of water, and that interest is thus subject to the navigational servitude. The plaintiff's takings claim based on this interest is not compensable and must be dismissed.

**B. To the Extent the Plaintiff Can Establish Damages Resulting from "Physical Interference" by the Red River, the Plaintiff May Have Stated a Claim upon Which Relief Could Be Granted.**

As delineated *supra,* the plaintiff in its pleadings makes numerous allegations of

damage to the lands comprising the Preserve and the flooding of Black/Clear Lake that the plaintiff contends is caused by the increased water level in Pool 3. In particular, the plaintiff references the "backwater effect from Pool 3" and "recurrent flooding" of the lake and surrounding land. While, as discussed above, the navigational servitude does extend to rights that derive from the use of or access to navigable waters, the navigational servitude does not extend to the taking of property by means of backwater flowing from a navigational body of water. The Supreme Court first made this distinction in *United States v. Cress*, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917). In *Cress*, the Court held that the government was liable for damages to private lands caused by consistent flooding that resulted from the raising of two rivers to improve their navigability. *Id.* at 327, 37 S.Ct. 380. The Court stated:

The findings, however, render it plain that this is not a case of temporary flooding or of consequential injury, but a permanent condition, resulting from the erection of the lock and dam, by which the land is "subject to *frequent overflows of water from the river.*" That overflowing lands by permanent backwater is a *direct invasion,* amounting to a taking, is [well-settled]. . . . There is no difference of kind, but only of degree, between a permanent condition of continual overflow by backwater and a permanent liability to intermittent but inevitably recurring overflows; and, on principle, the right to compensation must arise in the one case as in the other.

*Id.* at 327–28, 37 S.Ct. 380 (internal citations omitted) (emphasis added). The Court also distinguished its reasoning from that employed in cases *"where no water was thrown back on claimant's land,* and the damage was confined to an interference with the access thence to the navigable portion of the river." *Id.* at 327, 37 S.Ct. 380 (emphasis added).

In *United States v. Kansas City Life Insurance Co.*, 339 U.S. 799, 802, 70 S.Ct. 885, 94 L.Ed. 1277 (1950), the Court relied on *Cress* to find that a landowner was entitled to compensation for the destruction of his property due to "undersurface invasion" from a navigable river nearby. The Court found that the land at issue "was permanently invaded by the percolation of the waters from both the river and its tributary." *Id.* at 810, 70 S.Ct. 885. The Court further stated:

"Whether the prevention of the use of the land for agricultural purposes was due to its invasion by water from above or from below, it was equally effective. *The destruction of land value, without some actual invasion of the land and solely by preventing the escape of its own surface water, is not before us.*"

*Id.* (emphasis added). Each of these cases awarded compensation to landowners for a direct physical invasion of their land by water originating in a navigable river. In *Cress*, the plaintiff's property was flooded by backwater. In *Kansas City Life Ins.*, the plaintiff's property was flooded by subsurface water. The common factor in both cases is that the damage to the plaintiffs' property resulted from a *physical invasion* by the government of the plaintiffs' land.

In this case, the plaintiff has alleged that backwater from Pool 3 and other flooding has damaged Black/Clear Lake and the Preserve. While it is difficult to fully understand how the raising of Pool 3 has resulted in a "physical invasion" of the plaintiff's property by either backwater or subflooding from the Red River, if the plaintiff's allegations are accurate, then the plaintiff may have stated a claim for relief that would not be subject to the navigational servitude. If the plaintiff can demonstrate that its property interest has been taken by the government due to a direct physical invasion of water from the Red River, which has resulted in higher water levels in Black/Clear Lake or flooding of the surrounding lands, the plaintiff may be entitled to compensation. Accordingly, with regard to these contentions, judgment on the pleadings is not appropriate and the plaintiff will be given an opportunity to establish its claim for a taking based on a physical invasion of its property interest.

## CONCLUSION

For all of the foregoing reasons, the government's motion is **GRANTED–IN–PART**

and **DENIED–IN–PART.** The parties are **ORDERED** to complete fact discovery on the effect of the government's action on the plaintiff's alleged property interest. The parties shall file a joint status report, if they can agree, or separate status reports if they cannot agree, by **Thursday, November 15, 2007** proposing the next steps in this litigation.

**IT IS SO ORDERED.**