# United States Court of Appeals for the Federal Circuit

2008-5039

NORTHWEST LOUISIANA FISH & GAME
PRESERVE COMMISSION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

William P. Crews, Jr., William P. Crews, Jr., LLC, of Natchitoches, Louisiana, argued for plaintiff-appellant.

Mark R. Haag, Attorney, Environmental & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Ronald J. Tenpas, Assistant Attorney General, and Kathryn E. Kovacs, Attorney. Of counsel was Kathryn J. Barton, Attorney.

Appealed from: United States Court of Federal Claims

Judge Nancy B. Firestone

# United States Court of Appeals for the Federal Circuit

2008-5039

NORTHWEST LOUISIANA FISH & GAME PRESERVE COMMISSION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims in case no. 02-CV-1031, Judge Nancy B. Firestone.

_____

DECIDED:  July 31, 2009

_____

Before LOURIE, RADER, and DYK, <u>Circuit Judges</u>.

Opinion for the court filed by <u>Circuit Judge</u>, RADER.  Additional View filed by <u>Circuit Judge</u>, RADER.

RADER, <u>Circuit Judge</u>.

The United States Court of Federal Claims dismissed the Northwest Louisiana Fish & Game Preserve Commission's Fifth Amendment taking claim based on the United States' construction and operation of a navigation project on the Red River. Because the Court of Federal Claims correctly determined that the Commission's property interest arose from access to and use of a navigable waterway, this court affirms.

I.

The Red River rises in the Texas panhandle and flows east along the Texas-Oklahoma and Texas-Arkansas borders, then south into Louisiana, eventually emptying into the Atchafalaya and Mississippi Rivers. The State of Louisiana built the Allen Dam to maintain water levels and prevent backwater flooding of the Red River. The Allen Dam created three lakes: Black Lake, Clear Lake, and Saline Lake. Black Lake and Clear Lake are connected. In fact, the local community often calls them the Black/Clear Lake. In 1926, the State of Louisiana established the Northwest Louisiana Fish & Game Preserve Commission ("Commission") to enhance wildlife and fishery habitat and recreational opportunities in the area.

The Saline Bayou tributary connects Black/Clear Lake to the Red River. Water released from Black/Clear Lake flows through Saline Bayou for ten miles before emptying into the Red River. In the past, the Commission controlled fish population and aquatic vegetation growth in Black/Clear Lake by draining, or drawing down, the lake into the Red River through the Saline Bayou.

In 1968, Congress authorized the "Red River Navigational Project" with the intent of improving navigation to allow year-round navigation on the Red River. The project increased water depths along the Red River by constructing five lock and dam combinations at various points along the river. The area of the Red River between each successive lock and dam combination constitutes a pool. The locks and dams operate to insure that each pool is sufficiently deep to allow for year-round navigation.

The Saline Bayou connects Black/Clear Lake to the area of the Red River that constitutes Pool 3. Before the locks, the United States Army Corps of Engineers

("Corps") maintained Pool 3 at a depth of eighty-seven feet above mean sea level ("MSL"). Because the Saline Bayou empties into Pool 3, the water level at that point in the river directly affects the draw down potential of the Saline Bayou and hence, Black/Clear Lake.

In 1982, the Allen Dam failed. In response, the State constructed an emergency closure to prevent the total drainage of Black/Clear Lake. Following the failure, the Commission sought approval to construct a new dam. The new dam—known as the Black/Clear Lake Dam—was subject to the permit requirements of Section 404 of the Clean Water Act. 33 U.S.C. § 1344. The Corps issued the permit, which included a clause that provided that the United States "does not assume any liability" for "damages to the permitted project or uses thereof as a result of current or future activities undertaken by or on behalf of the United States in the public interest."

After construction of the Black/Clear Lake Dam, the Commission periodically released large amounts of water into the Red River in order to lower the water level and control the growth of unwanted aquatic vegetation. Using this procedure, the Commission maintained acceptable levels of fish and plant growth in Black/Clear Lake. The last scheduled draw down of Black/Clear Lake occurred in the fall of 1994, lowering the level of the lake by eight feet.

In early 1995, the Corps raised the level of Pool 3 to ninety-five feet MSL, eight feet MSL above its previous level. At this water level, the Commission could only lower Black/Clear Lake by a maximum of 4.5 feet, between 3.5 and 6.5 feet less than what the Commission required to prevent unwanted aquatic growth. The uncontrolled growth of aquatic weeds began to cause significant damage by early 1995.

In late 1996, the Commission requested the Corps to lower the water level of the Red River to allow for the draw down of Black/Clear Lake. The Commission contended that the new water level in Pool 3 limited its ability to control the growth of unwanted vegetation. The Corps denied the Commission's request. By early 1997, severe hydrilla and coontail infestation began to occur, allegedly making some parts of the Lake useless for recreation.

The Commission has been seeking redress since 1997 for the alleged condemnation of the preserve as a result of the United States' construction and operation of the Red River Navigational Project. The Commission first filed a complaint in state court, which was subsequently removed to federal court and dismissed. The dismissal was appealed to the Fifth Circuit, where that court affirmed the dismissal. Nw. La. Fish & Game Pres. Comm'n v. Red River Waterway Comm'n, 220 F.3d 584 (5th Cir. 2000) (unpublished per curiam). The Commission next filed an administrative claim sounding in tort against the government that was eventually transferred to the United States Court of Federal Claims. Nw. La. Fish & Game Pres. Comm'n v. United States, 62 Fed. Cl. 760, 761 (2004).

On March 31, 2004, the government filed a Motion for Judgment on the Pleadings under Rule 12(b)(1) for lack of subject matter jurisdiction and/or under Rule 12(b)(6) for failure to state a claim upon which relief could be granted. The Court of Federal Claims dismissed on the basis that the claim was not filed within the Tucker Act's six-year statute of limitations. Id. at 768. The Commission then appealed to the Federal Circuit. This court reversed the Court of Federal Claims, holding that the statute of limitations did not begin to run until 1997, after the appearance of significant

growth of aquatic weeds in Black/Clear Lake and the Corps' refusal to lower the water level in Pool 3. Nw. La. Fish & Game Pres. Comm'n v. United States, 446 F.3d 1285 (Fed. Cir. 2006).

On remand, the Court of Federal Claims requested supplemental briefing on the remaining issues and on October 31, 2007, granted in part and denied in part the United States' motion to dismiss. Nw. La. Fish & Game Preserve Comm'n v. United States, 79 Fed. Cl. 400 (2007). The Court of Federal Claims entered judgment dismissing the claims sounding in tort. Id. at 406. The court also dismissed the taking claim based on the inability to control water levels and aquatic growth in Black/Clear Lake as barred by the navigational servitude. Id. at 411. The Court of Federal Claims declined to grant judgment on the Commission's claim that the backwater from Pool 3 and other flooding resulted in a physical invasion. Id. at 411-12. The court noted that if the Commission could demonstrate such a physical invasion, it may be entitled to compensation. Thus, the taking claim based on physical invasion, e.g., due to backwater flooding, is still pending before the Court of Federal Claims. That court certified its judgment for interlocutory appeal under its Rule 54(b).

The Commission timely appealed to this Court. On appeal, the Commission submits that the Court of Federal Claims erred when it dismissed its taking claim as barred by the navigational servitude. The Commission does not challenge the dismissal of its claims sounding in tort.

II.

This Court reviews without deference the Court of Federal Claims' dismissal of a complaint for lack of jurisdiction or failure to state a claim. Samish Indian Nation v.

<u>United States</u>, 419 F.3d 1355, 1363 (Fed Cir. 2005). When considering a motion to dismiss, the trial court views well-pleaded factual allegations in the complaint as true. <u>Reynolds v. Army & Air Force Exch. Serv.</u>, 846 F.2d 746, 747 (Fed. Cir. 1988).

The Fifth Amendment instructs that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. The taking calculus first identifies the private party's property interest; then the analysis weighs whether that property has been deprived or abridged sufficiently to qualify as "taken." <u>Members of Peanut Quota Holder Ass'n v. United States</u>, 421 F.3d 1323, 1330 (Fed. Cir. 2005). In other words, a compensable Fifth Amendment taking requires a showing that the Government has taken a legally protected property right. <u>United States v. Willow River Power Co.</u>, 324 U.S. 499, 503 (1945). Not all property interests are legally protected property rights. "[O]nly those economic [interests] are 'rights' which have the law [in] back of them, and only when they are so recognized may courts compel others . . . to compensate for their invasion." <u>Id.</u> at 502.

The Commerce Clause confers upon Congress "a unique position" with respect to navigable waters. <u>United States v. R.B. Rands</u>, 389 U.S. 121, 122 (1967). "The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of <u>all</u> navigable waters of the United States." <u>Id.</u> at 122-23 (quoting <u>Gilman v. City of Phil.</u>, 70 U.S. (3 Wall.) 713, 724-25 (1866)) (emphasis added). This power to regulate navigation confers upon the United States a "dominant servitude" on navigable waters. <u>Id.</u> at 123. As a result, conflicts of interest between riparian owners and the Government are not to be reconciled as between equals, "but the private interest must give way to a superior right, or perhaps it would be more accurate to say

that as against the Government such private interest is not a right at all." Willow, 324 U.S. at 510. An interest that "arises from access to, and use of, navigable waters" falls within the Government's dominant servitude, and any private interest is subservient to that servitude. R.B. Rands, 389 U.S. at 124-25.

The Government's navigational servitude is derived from the principle that all navigable waters in the United States are considered public property. Owen v. United States, 851 F.2d 1404, 1408 (Fed. Cir. 1998) (en banc). This court has acknowledged the extraordinary priority given to navigable waters, noting that they are under the "exclusive control of the federal government." Id. The physical limits of the dominant servitude include "the entire . . . stream, which includes the lands below ordinary high water mark." United States v. Chi. Milwaukee, St. Paul, & Pac. R.R. Co., 312 U.S. 592, 596-97 (1941). The dominant servitude defines the limits within which Congress can work to improve navigation without creating an obligation to pay just compensation under the Fifth Amendment. Owen, 851 F.2d at 1408. The Supreme Court has explained that the proper exercise of the Government's dominant servitude in these areas does not constitute

> an invasion of any private property right in such lands for which the United States must make compensation. The damage sustained results not from a taking of the riparian owner's property in the stream bed, but from the lawful exercise of a power to which that property has always been subject.

Chi. Milwaukee, 312 U.S. at 596-97. As a dominant servitude, it "can be asserted to the exclusion of any competing or conflicting one." United States v. Twin City Power Co., 350 U.S. 222, 224-25 (1956).

III.

This case arises from a conflict between the Commission's responsibility to maintain a natural preserve and the Corps' responsibility to maintain year-round navigation along the Red River. In the first instance, this court must consider whether the "property right" asserted is in fact a legally protectable property right. <u>Willow</u>, 324 U.S. at 502-03.

Whether an interest is a protectable right under the Fifth Amendment takes into consideration such things as "the navigable or non-navigable nature of the waters from which [the grievant] advantages," and "whether the conflict is with another private riparian interest or with a public interest in navigation." <u>Id.</u> In <u>Willow</u>, a hydroelectric plant that operated under the head produced by the elevation difference between the Willow River and the St. Croix River sought compensation for impaired efficiency of its plant after the Government raised the water level of the St. Croix by three feet. The Supreme Court held that the Willow River Power Company (Willow Power) did not have a legally protected right in the level of the St. Croix River as a run-off for tail waters of its hydroelectric power plant. <u>Id.</u> at 509-11.

The Court reasoned that because the Willow River was a navigable river and the conflict did not arise between private riparian interests but between a private riparian owner and the public interests within the navigational servitude, Willow Power's interest in the level of the St. Croix River was subservient to the Government's dominant servitude. <u>Id.</u> at 509-10. Willow Power's interest "constituted a privilege or a convenience, enjoyed for many years, permissible so long as compatible with navigation interests, but it is not an interest protected by law when it becomes

inconsistent with plans authorized by Congress for improvement of navigation." Id. at 509. Although both the Government and Willow Power had interests in the water level of the St. Croix, these interests were not to be "reconciled as between equals, but the private interest must give way to a superior right." Id. at 510. The Government had not taken a legally protected property right from Willow Power and thus was not required to pay compensation because Willow Power's interest arose from access to a navigable waterway. Id. at 511.

On appeal, Appellants argue that their property interest does not fall within the Government's servitude for two principle reasons: (1) Saline Bayou is not a navigable waterway and (2) Black/Clear Lake is simply outside of the navigational servitude.

First, regardless of the navigability of the Saline Bayou, the Red River is a navigable waterway. The ability to draw down Black/Clear Lake depends on the water levels of not only the Saline Bayou, but also of the Red River. In this case, the water level of Pool 3 was originally at eighty-seven feet MSL. In early 1995, it was raised to ninety-five feet MSL, an increase of eight feet MSL.

As was the case in Willow, the Commission's property interest in draining water into the Red River depends on "access to, and use of, navigable waters." Willow, 324 U.S. at 503. Thus, the Court of Federal Claims correctly concluded:

> to the extent the [appellant] bases its takings claim on the ability to drain from Black/Clear Lake into the Red River, which requires the elevation of the Red River to be below a certain level, the plaintiff's property interest is subservient to the navigational servitude.

Nw. La. Fish & Game Pres. Comm'n v. United States, 79 Fed. Cl. 400, 411 (2007). Because the Commission's interest is subservient to the Government's dominant servitude, it is not compensable under the Fifth Amendment.

Turning to the Appellant's second argument, the Government's navigational servitude does not create a blanket exception to Fifth Amendment takings. See Kaiser Aetna v. United States, 444 U.S. 164 (1979) (considering whether there was a physical invasion). The servitude encompasses the power to regulate the stream itself and the lands beneath the ordinary high-water mark ("OHWM"). The Government must compensate for any taking of property above the OHWM. See, e.g., Baskett v. United States, 8 Cl. Ct. 201, 209 (1985); Tri-State Materials Corp. v. United States, 550 F.2d 1, 5 (Ct. Cl. 1977); Goose Creek Hunting Club, Inc. v. United States, 518 F.2d 579, 583 (Ct. Cl. 1975). The Appellants submit that Black/Clear Lake falls well outside the physical OHWM of the Red River and that, even if the Government's actions were within the OHWM, the effects spread outside of the OHWM and amount to a compensable taking.

This court has recognized that Government action with effects outside the OHWM may amount to a compensable taking. See Owen, 851 F.2d at 1418. In Owen, the Corps dredged and widened portions of the Tombigbee River. Id. at 1406-07. The dredging caused an increase in water speed and drastically increased erosion of the river bank. The erosion eventually undermined the land owner's property and caused her house to collapse into the river. Id. In weighing Owen's property interest against the Government's interest in controlling navigable waters, this court concluded that a compensable taking had occurred, even though the water had not been raised above its OHWM and was therefore technically within the government's dominant servitude:

> [T]he allegedly taken property was the native soil and rock which, although below the high-water mark, supported the fast land and house located beyond the high-water mark . . . . There must also be horizontal limits to the "bed" of a river; otherwise, the navigational servitude would extend

> infinitely in all directions and swallow up any claim for "just compensation" under the Fifth Amendment for damages occurring anywhere below the elevation of the high-water mark.

Id. at 1410. This case, however, does not present a situation analogous to Owen.

Here, the Commission's property interest—the ability to draw down the Black/Clear Lake in order to control unwanted aquatic weed growth—arises from access to, and use of navigable waters. See, e.g., Willow, 324 U.S. at 503. As such, the Court of Federal Claims properly found that the Commission's economic value in the property arose from access to and use of a navigable waterway. Thus, the navigational servitude bars the Commission's taking claim.

IV.

To the extent that the Commission asserts a taking of its ability to draw down Black/Clear Lake in order to control unwanted aquatic weed growth, that interest is subservient to the Government's navigational servitude. Because the Court of Federal Claims properly dismissed the Commission's claim as barred by the navigational servitude, this court affirms.

AFFIRMED

# United States Court of Appeals for the Federal Circuit

2008-5039

NORTHWEST LOUISIANA FISH & GAME PRESERVE COMMISSION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims in case no. 02-CV-1031, Judge Nancy B. Firestone.

RADER, <u>Circuit Judge</u>, additional view.

While I endorse the reasoning and results of the panel, I write separately to highlight a distressing ambiguity in this court's binding precedent. Neither this court nor the Supreme Court has proffered any material basis justifying a different treatment of navigation versus other Fifth Amendment public purposes. Why should navigation be received any differently than highway transportation, public safety, or environmental protection? In light of the special protections afforded to navigation, it seems only prudent that such a material basis be provided.